

FILED

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

AUG 2 7 2014

U.S. COURT OF
FEDERAL CLAIMS

| | | |
|---|---|---|
| **OAK GROVE TECHNOLOGIES, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14- 782C |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF AN EMERGENCY
## MOTION FOR DECLARATORY RELIEF, A TEMPORARY
## RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.    STATEMENT OF CASE .........................................................................2

II.   JURISDICTION ....................................................................................3

III.  FACTUAL BACKGROUD ....................................................................4

    A.  The Procurement .......................................................................4

    B.  The Protest ................................................................................5

    C.  FSI's Stated Basis for the CICA Stay Override.........................5

IV.  STANDARD OF REVIEW ...................................................................6

    A.  Motions for Injunctive Relief....................................................6

    B.  Motion for Declaratory Judgment .............................................6

    C.  CICA Override Decision ...........................................................8

V.   ARGUMENT.........................................................................................9

    A.  FSI's Override Determination Lacks A Rational Basis ...................9

        1.  FSI Has Not Identified Any Significant Adverse Consequences that Might Occur If the Stay Remains in Place .................................9

        2.  FSI Has Arbitrarily Dismissed Reasonable Alternatives To An Override .................................................................12

        3.  FSI's Cost Analysis Is Inadequate.............................................15

        4.  FSI Ignores The Impact of Its Override Decision On The Integrity of the Procurement System .......................................17

    B.  Oak Grove Is Entitled to Injunctive Relief........................................18

VI.  REQUEST FOR RELIEF ....................................................................19

## TABLE OF AUTHORITIES

**CASES**

Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25 (2006)...............................*passim.*

Banknote Corp. of Am. v. United States, 365 F.3d 1345 (Fed. Cir. 2004).................………..…...3

Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464 (2004)................................3, 13

Chapman Law Firm Co. v. United States, 65 Fed. Cl. 422 (2005)…………………………........8

CIGNA Government Services, LLC v. United States, 70 Fed. Cl. 100 (2006)................*passim.*

E-Management Consultants, Inc. v. United States, 84 Fed. Cl. 1 (2008)......................*passim.*

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir.

2001)………...…......................................................................................…..7

Motor Vehicle Mfr. Ass'n. of U.S., Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29

(1983)………………………………………………………………………...…7

Nortel Gov't Servs., Inc. v. United States, 84 Fed. Cl. 243 (2008)................................8, 14

PGBA, LLC v. United States, 389 F.3d 1219 (Fed. Cir. 2004)…………………………….......6

PGBA, LLC v. United States, 57 Fed. Cl. 655 (2003)…………………………………..*passim.*

PMTech, Inc. v. United States, 95 Fed. Cl. 330 (2010)…………………………….…….….8

RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999)....................3

Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006)…………....….........*passim.*

Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560 (2000)....................................19

Superior Helicopter LLC v. United States, 78 Fed. Cl. 181 (2007)……......................*passim.*

Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369 (2013).........................8, 14

Univ. Research Co. v. United States, 65 Fed. Cl. 500 (2005)………………………………...14

URS Federal Services, Inc. v. United States, 102 Fed. Cl. 674 (2012)............................7, 8

**STATUTES**

5 U.S.C. § 706, *et seq.* ...………………………………………………………………………6

28 U.S.C. § 1491, *et seq.* …………………………………………………………………....3, 6

31 U.S.C. § 3553, *et seq.* ...…..………………………………………………………..*passim.*

**REGULATIONS**

Federal Acquisition Regulation § 33.104(c)(1)……...……………………………………....5

Federal Acquisition Regulation § 16.505(c)(3)………………………………………………13

H.R. Rep. No. 98-861 (1984)…………….…………………………………………….....15

H.R. Rep. No. 99-138 (1985) …………………………………………………………………18

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | |
|---|---|
| **OAK GROVE TECHNOLOGIES, LLC,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. _____ |
| **THE UNITED STATES OF AMERICA,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF AN EMERGENCY MOTION FOR DECLARATORY RELIEF, A TEMPORARY RESTRAINING ORDER, AND A PRELIMINARY INJUNCTION

Oak Grove Technologies, LLC ("Oak Grove"), by its undersigned counsel, and in accordance with the Rules of the Court of Federal Claims ("RCFC"), Rules 7, 57 and 65, hereby submits its Memorandum in Support of its Emergency Motion for Declaratory Relief, a Temporary Restraining Order and a Preliminary Injunction (the "Motion"). The Motion requests the court issue declaratory and injunctive relief as a result of the Department of State, Foreign Service Institute's ("FSI") override of a stay of contract performance imposed pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3)(A)(ii) (2006), and in connection with a bid protest filed by Oak Grove at the Government Accountability Office ("GAO"). As set forth in greater detail below, FSI's determination to override the CICA stay is arbitrary, capricious and lacks a rational basis.

## I.   STATEMENT OF THE CASE

This case concerns a procurement conducted by FSI for eLearning development support services.  FSI offers training to the United States diplomatic community and other agency civilian employees.  The program at issue is training provided "on-line" through the world wide web.  An incumbent contractor currently performs the majority of the support services set forth in the Request for Quotes ("RFQ") issued in this procurement.

Oak Grove, a small business, submitted a proposal in response to the RFQ.  Earlier this month, FSI notified Oak Grove that it would not be awarding Oak Grove a Task Order and that two Task Orders had been awarded to other offerors.  Shortly thereafter, Oak Grove filed a timely protest at the GAO challenging FSI's two Task Order awards, triggering the stay of performance under CICA.

On August 22, 2014, FSI advised Oak Grove it was overriding the CICA stay.  FSI provided Oak Grove with its Determination and Findings ("D&F") justifying the override decision as in the "best interests of the United States".  The D&F indicates the primary reason for FSI overriding the CICA-imposed stay is its belief that the RFQ includes requirements different from those in the incumbent Task Order's scope of work.  FSI contends that, for this reason, it cannot extend the incumbent Task Order and must proceed with performance under the awarded Task Orders.

FSI, however, does not explain in the D&F how the failure to immediately implement the allegedly new requirements reflected in the RFQ necessarily affects the nation's interests.  FSI also does not consider all of the reasonable alternatives to the override nor does it fully assess the costs the agency may have to incur should GAO grant Oak Grove's protest.  Finally, FSI ignores

the irreparable harm Oak Grove will suffer in the event the Task Order awardees are allowed to begin performance.

Oak Grove requests the Court grant it emergency injunctive relief prohibiting FSI from allowing performance under the awarded Task Orders until GAO has issued a decision in the pending protest. Oak Grove also requests the Court grant a declaratory judgment finding that FSI's override decision is arbitrary, capricious and lacks a rational basis.

## II.    JURISDICTION

The Tucker Act gives the United States Court of Federal Claims (the "Court") jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The United States Court of Appeals for the Federal Circuit has held the Court possesses subject matter jurisdiction under the Tucker Act to review an agency decision to override an automatic stay of contract performance pursuant to CICA. RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289-90 (Fed. Cir. 1999). This jurisdiction extends to override determinations premised on the "best interests of the United States," as alleged in this case. Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 466 (2004).

Oak Grove, a disappointed bidder in FSI's procurement for eLearning support services, qualifies as an "interested party" under the Tucker Act. Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351-52 (Fed. Cir. 2004).

## III.   FACTUAL BACKGROUND

### A. <u>The Procurement</u>

On June 13, 2014, FSI issued RFQ No. SFSIAQ-14-R-0002 for eLearning development

services in support of FSI's eLearning development program (the "RFQ"). FSI is the U.S.

Government's primary training institution for officers and support personnel of the U.S. Foreign

Affairs community.   The RFQ's scope of work concerns the development and delivery of web-

based multimedia courses, products, materials and related services for an audience that includes

U.S. diplomats and civilian employees at various federal agencies.  The RFQ, however, does not

identify or require the development of particular courses or course materials; instead, the RFQ

indicates the type of support services FSI requires and the position titles and descriptions of the

staff necessary to provide these services in support of FSI's eLearning program.

The RFQ contemplates the award of one or more Task Orders under offeror Federal

Supply Schedules.[1]  The period of performance is for a one-year base period and four (4) one-

year option periods. The RFQ does not state an anticipated value of the Task Orders that FSI

would award pursuant to the RFQ, but FSI has stated it received offers at proposed prices

between $36 million and $41 million, assuming FSI exercises all options.

Oak Grove submitted an offer in response to the RFQ.  On July 22, 2014, FSI notified

Oak Grove that FSI rated its proposal as "Excellent" and that its proposal was included in the

competitive range.  After FSI considered the oral presentations given by each offeror in the

competitive range, FSI notified Oak Grove on August 5, 2014 that FSI had not selected the Oak

Grove proposal for the award of a Task Order.  The notice stated FSI had awarded Task Orders

---

[1] It is unclear whether FSI intends to issue Task Orders against an offeror's GSA Schedule 70 or another schedule.
FSI's response to questions posed by offerors suggests that it would issue a Task Order against any schedule
proposed by an offeror. <u>See</u> Exhibit A, SFSIAQ14R0002, eLearning Development Services Solicitation, Questions
& Answers, Q&A No. 7, attached hereto ("Please map position descriptions to all the companies' current GSA
schedules.").

to two other offerors, Coley & Associates, Inc. ("Coley") and The Ventura Group, Inc. ("Ventura").

### B. The Protest

On August 14, Oak Grove filed a protest challenging FSI's award decision at GAO. Oak Grove filed its protest within ten calendar days of FSI's award of the Task Orders; accordingly, consistent with CICA's stay provisions and Federal Acquisition Regulation ("FAR") §33.104(c)(1), FSI was required to suspend contract performance under the awarded Task Orders.

On Friday, August 22, FSI informed the GAO and Oak Grove that the agency had decided to override the CICA-imposed stay of contract performance. See Exhibit B, attached hereto.

### C. FSI's Stated Basis for the CICA Stay Override

FSI provided Oak Grove with the agency's Determination and Findings ("D&F") in support of its decision to override the stay. See Exhibit C, attached hereto. FSI contends it is in the best interests of the United States for FSI to override the stay. In particular, FSI states maintaining the stay of contract performance will "negatively impact" FSI's eLearning design and development program. FSI explains it cannot extend the incumbent Task Order as the RFQ included requirements not included in the incumbent Task Order scope of work. According to FSI, if there is a delay in performing these new Task Order requirements, the "technical operability" of FSI's "current course portfolio would be compromised." Exhibit C at 2. FSI also states certain eLearning courses "would not be delivered to stakeholders upon committed launch date" and certain eLearning courses "would not be delivered" at all. Exhibit C at 3.

In the D&F, FSI determines that the risks associated with the delay in performance of the Task Orders outweighs the supposed $1 million plus costs associated with terminating the awarded Task Orders in the event Oak Grove prevails in its protest at GAO. FSI also concludes that the override will not prejudice Oak Grove and that Oak Grove will be free to compete for a Task Order award in the event GAO sustains the protest.

## IV.    STANDARD OF REVIEW

### A.  Motions for Injunctive Relief

For the purposes of the immediate and emergency injunctive relief requested, this Court will apply the standard of review applicable to requests for injunctive relief, this standard requires Oak Grove to demonstrate: (1) a likelihood of success in this case; (2) it will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

### B.  Motion for Declaratory Judgment

The Court considers Motions for Declaratory Judgment under the standard of review prescribed by the Administrative Procedures Act, 5 U.S.C. § 706 (the "APA"). See Administrative Disputes Resolution Act, 28 U.S.C. § 1491(b)(4). The APA requires the Court to decide whether FSI's override decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006). The Court has held that an override decision is "arbitrary or capricious" if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

00009800

Motor Vehicle Mfr. Ass'n. of U.S., Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983). In this regard, the Court has held that it must overturn FSI's override decision if it determines an agency's override decision lacks a rational basis or if the decision involves a violation of regulation or procedure. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In determining whether the override decision was made on a "rational basis," the Court will examine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Impresa, 238 F.3d at 1332-33.

With respect to the issue of whether the agency has failed to consider "an important aspect of the problem," the Court has identified five factors that should be considered:

> (1) whether significant adverse consequences would occur if the agency did not override the stay, (2) whether reasonable alternatives to the override were available, (3) how the benefits of overriding the stay compared to the potential cost of the override, including costs associated with the potential that the protester might prevail before GAO, and (4) the impact of the override on the competition on the integrity of the procurement system.

Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 711 (2006); see also URS Federal Services, Inc. v. United States, 102 Fed. Cl. 674 (2012); E-Management Consultants, Inc. v. United States, 84 Fed. Cl. 1, 4 (2008); Superior Helicopter LLC v. United States, 78 Fed. Cl. 181, 189 (2007).

The Court also has identified factors which Congress did not intend for any agency to consider in the override context. Specifically, the agency cannot justify the decision to override a stay because the agency considers the new contract to be superior to the incumbent contract or the agency prefers an override to other alternatives. Reilly's Wholesale, 73 Fed. Cl. at 711; see also Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25, 30 (2006).

The standard of review applicable for requests for declaratory relief should apply for the ultimate resolution in this case, consistent with prior rulings of this Court.  See Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369 (2013); URS Federal Services, Inc. v. United States, 102 Fed. Cl. 674 (2012); PMTech, Inc. v. United States, 95 Fed. Cl. 330 (2010); E-Management, 84 Fed. Cl. 1; Nortel Gov't Servs., Inc. v. United States, 84 Fed. Cl. 243 (2008); CIGNA Government Services, LLC v. United States, 70 Fed. Cl. 100 (2006); Advanced Sys., 72 Fed. Cl. 25; and Chapman Law Firm Co. v. United States, 65 Fed. Cl. 422 (2005).  As the Court noted in Advanced Sys., "[t]here does seem to be some incongruity in forcing a plaintiff to meet the high burden necessary for obtaining extraordinary relief, when the statute gives presumptive weight to the otherwise required showings of irreparable harm and public interest."  Advanced Sys., 72 Fed. Cl. at 36; Chapman, 65 Fed. Cl. at 424 ("Declaratory relief preserves the scheme that Congress intended.").

## C. **CICA Override Decision**

Per CICA, once a timely protest is filed with GAO challenging an agency contract award, the agency that is the subject of the protest must "immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii) (2006).  Also known at the "automatic stay," the suspension of contract performance is supposed to continue until GAO issues its decision in the protest.  See 31 U.S.C. § 3553(d)(3)(B).

CICA allows any agency to "override" the stay in two limited circumstances:  (1) where continued performance "is in the best interests of the United States" or (2) where "urgent and compelling circumstances that significantly affect interests of the United States" exist.  31 U.S.C.

§ 3553(d)(3)(C)(i). FSI claims the override in this case "is in the best interests of the United

States."

## V.    ARGUMENT

### A. FSI's Override Determination Lacks A Rational Basis

#### 1. FSI Has Not Identified Any Significant Adverse Consequences that Might Occur If the Stay Remains In Place

The D&F does not identify specific, significant adverse consequences to the interests of

the United States that will necessarily occur if the CICA stay is reinstated. Reilly's Wholesale,

73 Fed. Cl. at 711. Instead, the basis for the override appears to be that keeping the stay in place

will result in a delay and, therefore, "negatively impact" FSI's ongoing design and development

of eLearning courses, materials and products. See Exhibit C at 2. The "negative impacts"

resulting from the delay referred to by FSI include a "compromise" of the "technical operability"

of FSI's entire course portfolio; the failure to deliver certain courses in the process of design and

development by the "committed launch date;" and the non-delivery of certain eLearning courses.

Exhibit C at 3 and 6. FSI concludes that the "non-delivery and undue delay" in the design and

development of its eLearning courses "carries significant risks for the Department in both cost to

the USG and implementation of a new progressive [Instructional Design Services] program."

Exhibit C at 4.

FSI's justification for the override is long on generalities and short on specifics. The crux

of FSI's justification is that continuing the stay will delay the implementation of the new

requirements identified in the RFQ in FSI's eLearning program. However, as FSI itself

acknowledges, all but one of the requirements in the RFQ are included in the incumbent Task

Order statement of work. Exhibit C at 2. FSI does not make any attempt in the D&F to

distinguish the harm the eLearning program may suffer if *all work* under the Task Orders was

stopped on the program from the harm the eLearning program may suffer if just the one, new

RFQ requirement is not implemented in a timely manner.

Assuming that even part of what FSI argues is true, that *some* courses may be disrupted

and *some* courses may not be delivered if FSI cannot immediately implement the RFQ's one,

new requirement, the supposed adverse consequences of this disruption and non-delivery

identified by FSI in the D&F is pure hyperbole. Most of the "negative impacts" cited by FSI in

the D&F are impacts to the eLearning program itself, not to the Government's best interests. [2]

See Reilly's Wholesale, 73 Fed. Cl. at 707 ("A decision to override the automatic CICA

provisions is a very serious matter and requires a determination that the best interests of the

United States, not just the agency involved, will be significantly affected."); PGBA, LLC v.

United States, 57 Fed. Cl. 655, 663 (2003) (noting that CICA "does not allow the agency to

override the stay when it is in the best interests of that agency or the agency's contracting

officials"). Where FSI does attempt to focus on the national interest, the harms cited are clearly

exaggerated. For example, FSI claims there is a potential for harm to the "welfare, health and

safety" of Government employees at foreign posts from the non-delivery of eLearning courses in

"crisis management, evacuation management and emergency preparedness." Exhibit C at 7.

While harm to the "welfare, health and safety" of Government employees abroad could be a risk

if these employees do not receive *any* training in "crisis management, evacuation management

and emergency preparedness," FSI ignores the fact that it delivers a number of courses on these

topics already. See Exhibit D, Excerpts from FSI Course Catalog, attached hereto. Accordingly,

---

[2] Indeed, in this regard, the D&F includes a "Freudian slip": "it is now in the best interest *of the Department* to
proceed with the Task Orders performance during the pendency of the subsequent protest." Exhibit C at 7
(emphasis added); see also Exhibit C at 8 ("This stay causes instability to the programmatic needs of FSI and
support of all eLearning Development services.").

it is highly unlikely that delaying performance of the new Task Orders for three months will put Government employees posted abroad in serious jeopardy.

In addition, when it comes to specifying the adverse consequences the United States will suffer if a stay is reinstated, FSI does not say these consequences will occur, but rather that they *may* occur. With respect to the non-delivery of crisis management, evacuation management and emergency preparedness courses, the D&F includes the statement that a delay in the performance of the new Task Orders may result in a "potential harm" to the welfare, health and safety of Government employees abroad. Exhibit C at 7. With respect to the only other example of harm to the best interests of the United States cited in the D&F, non-delivery of certain Cybersecurity courses, the D&F includes the statement that non-completion of these courses "may result in user deactivation." Exhibit C at 6. The agency, however, must show that the adverse consequences it identifies as resulting from the stay will *necessarily* occur. Reilly's Wholesale, 73 Fed. Cl. at 711 (emphasis added).

FSI's justification, therefore, is nothing more than a determination that a delay in implementing the new RFQ requirement will disrupt the delivery of FSI's existing courses and courses currently in development. However, delay and disruption occurs to some degree or another with every contract stay. See CIGNA, 70 Fed. Cl. at n. 5 ("Absent the stay, GAO's protest process -- an enforcement mechanism for competition in government procurement—can be rendered illusory or "toothless" if agencies cavalierly invoke best interest overrides and "extremely tight schedules" just to get on with their procurements."); see also PGBA, LLC, 57 Fed. Cl. at 663 (noting that avoiding delay is not the "sort of benefit. . . Congress had in mind in allowing an override in the 'best interests of the United States'"). FSI fails to demonstrate how any delay or disruption in implementation of the RFQ's new requirement, in particular, will

11

affect the United States' diplomatic mission. Accordingly, FSI's D&F does not pass muster as it fails to adequately identify the significant adverse consequences that necessarily will occur if the stay remains in place.

## 2. FSI Has Arbitrarily Dismissed Reasonable Alternatives To An Override

The D&F demonstrates FSI did not seriously consider a number of available alternatives to the override, including the extension of the incumbent Task Order. FSI rejects the option of extending the incumbent Task Order because the incumbent Task Order's scope of work is not identical to the scope of work set forth in the RFQ. In this respect, FSI states the RFQ imposes one new requirement and "expands" some of the incumbent Task Order requirements. Exhibit C at 2. FSI, however, does not adequately demonstrate that the incumbent Task Order precludes the performance of the allegedly new requirements for which FSI states it has a critical need.[3] Under the current scope of work, FSI describes generally the nature of the work that the contractor's staff will support during Task Order performance. The scope of work does not call for the production of specific deliverables or courses; instead, the scope of work identifies the position titles and position descriptions of the staff the contractor will provide under the Task Orders to support FSI's eLearning program. Thus, while the incumbent scope of work may not specifically indicate that the staff will be developing mobile applications of eLearning courses, for example, FSI has failed to show that the incumbent staff does not have the skills to support these tasks in addition to others originally referenced in the Task Order.

FSI does state the RFQ adds certain positions and position qualifications, implying the incumbent staff cannot fulfill the RFQ's new requirements. This conclusion, however, is undermined by FSI's statements in the RFQ. The RFQ requires the winning contractors to give a "right of first refusal" to the incumbent staff. In this regard, the RFQ states:

---

[3] A copy of the incumbent scope of work is not attached to the D&F.

00009800

> [t]he recipient shall retain and compensate the existing FSI/EX/ISD
> contract employees to the maximum extent possible.  A stable, qualified
> workforce reduces disruption to the delivery of services during the period
> of transition between management and provides the benefits of an
> experienced and trained workforce that is familiar with FSE/EX/ISD
> eLearning program material, personnel, facilities, and requirements.

RFQ at 39 of 93.  Thus, in contrast to FSI's position in the D&F that the incumbent staff is not

adequate to meet FSI's critical needs, in the RFQ FSI strongly encourage offerors to propose

using the incumbent staff because of the experience and training of this staff.

Finally, FSI does not address other alternatives available to it for avoiding delay in

performance of its allegedly new and expanded requirements.  See Reilly's Wholesale, 73 Fed.

Cl. at 714 (not considering certain alternatives "casts considerable doubt on the rationality of [the

agency's] override decision").  Since the initial period of performance of the incumbent Task

Order does not end until September 15, FSI could issue a change order to the incumbent Task

Order to address its supposed new and critical needs.  See Chapman, 62 Fed. Cl. at 467 (faulting

agency for not considering the option of exercising the "changes" clause in a contract to add a

new service).  FSI also could ask GAO to expedite resolution of the protest.  In addition, FSI

could explore the feasibility of awarding a bridge contract; given that this procurement involves

issuing Task Orders off of an existing Federal Supply Schedule, FSI could easily and quickly

issue a short term Task Order for a couple of additional positions, either from the incumbent or

another contractor with the appropriate schedule contract and personnel positions.  See also FAR

§ 16.505(c)(3) (authorizing sole-source follow-on task orders).  FSI also did not state that it

looked at other agency contract vehicles to assess whether it could meet its critical needs through

those vehicles.

Essentially, FSI rejects these reasonable alternatives, including modification and

extension of the incumbent Task Order, because the awarded Task Orders, in FSI's view, require

performance superior to that required under the incumbent Task Order. The superiority of the new contract, however, is not a legitimate basis for the override of a CICA-imposed stay of contract performance. See Reilly's Wholesale, 73 Fed. Cl. at 711; Advanced Sys., 72 Fed. at 31 (2006) ("The allegation that the new contract is better than the old one in terms of costs or performance is not enough to justify a best interests determination."); Superior Helicopter, 78 Fed. Cl. at 181 (remarking that the agency's conclusion that the new contracts were more "advantageous" than the incumbent contracts "is an invalid justification for overriding an automatic stay"); see also Supreme Foodservice GmbH, 109 Fed. Cl. at 369. As this Court explained in Supreme Foodservice, since the CICA stay is mandated by statute and the override represents a limited exception to that statutory mandate, "it would make little sense were the [override] to be available whenever an agency felt its latest solicitation was an improvement over the previous contract." Supreme Foodservice, 109 Fed. Cl. at 385. The Court went on to remark that, if an agency could rely on the fact that the new contract represented an "advancement" over the incumbent contract as a basis for an override of a CICA stay, "as a practical matter, the automatic stay would be meaningless in virtually every single instance in which a GAO protest was filed." Id. (quoting Univ. Research Co. v. United States, 65 Fed. Cl. 500, 503 (2005)); Nortel Gov't. Servs., 84 Fed. Cl. at 247-248 (noting that "[w]hen considering a best interests determination, there must be some rationale asserted by the agency that is above and beyond its original purpose when it solicited bidders for the procurement and "that absolves the agency of its obligation to await the GAO's recommendation") (quoting Advanced Sys. 72 Fed. Cl. at 31 (citations omitted).

### 3.  FSI's Cost Analysis Is Inadequate

FSI justifies the override decision in part on its determination that the risks associated with the delay in implementation of the supposed new RFQ requirements in its eLearning program outweigh the costs FSI may incur should GAO grant Oak Grove's protest. Specifically, FSI states its costs in the event GAO grants the protest will be limited to roughly $1.4 million. FSI, however, does not explain how it arrived at this dollar figure. In fact, the D&F does not address whether this figure reflects the termination costs to which the awardees would be entitled, the bid protest costs for which FSI would have to reimburse Oak Grove and/or the costs of reprocurement of the RFQ eLearning requirements. For these reasons, the Court should find FSI failed to adequately consider the "cost" side of the required cost-benefit analysis. See H.R. Rep. No. 98-861 at 1436 (1984)(CICA Conf. Rep.), *as reprinted in* 1984 US.C.C.A.N. 1445, 2124 (commenting that before deciding to override a stay based on the "best interests of the United States" exception, "the head of the contracting activity should consider potential costs to the government from carrying out relief measures as may be recommended by the Comptroller General if the protest is subsequently sustained").

FSI also argues that it may not have to incur *any* costs if GAO sustains the protest because the Task Order awards need not be disturbed in such an event. FSI explains in the D&F that it awarded multiple Task Orders and, should GAO grant Oak Grove's protest, FSI could just award Oak Grove an additional Task Order. Exhibit C at 7. This justification, however, ignores the nature of Oak Grove's protest. Oak Grove's protest alleges that FSI unfairly evaluated its offer in response to the RFQ. Oak Grove also alleges the agency impermissibly waived the RFQ requirement that the technologies demonstrated during offeror presentations were Section 508

15

compliant. If GAO grants Oak Grove's protest on this latter ground, GAO's recommendation will likely include termination of the two Task Order awards.

Even if GAO grants the protest solely on Oak Grove's first count, Oak Grove will only receive appropriate relief if FSI terminates the awarded Task Orders. In its responses to questions posed by offerors and Oak Grove, FSI indicated it would not award Task Orders reflecting specific *tasks*. Instead, FSI stated it would take the following, novel approach of awarding work based on the individuals hired by the Task Order awardees:

> The results of the right of first refusal process will determine the division of labor categories between contractors. The Government does not intend to split contractors by labor category, but by individual staff within categories. The Government intends that individual project teams (i.e. a specific eLearning course or a specific technical effort) will be comprised of mixed contracts rather than each labor category being awarded to one contractor.

Exhibit A, Q&A 14, eLearning Development Services Solicitation, Questions & Answers. In response to a specific follow-up question submitted by Oak Grove on this issue, FSI made a similar statement: "[a]ll awarded companies will have the opportunity to compete for the incumbent personnel during the right of first refusal process." See Exhibit E, E-mail from Nadia Shokry dated June 30, 2014.

Thus, FSI intends that the Task Order awardees compete for the incumbent personnel and only those that succeed in hiring the incumbent personnel will actually receive work under an awarded Task Order. If this is the case, and the Court confirms FSI's override of the stay, one or both of the Task Order awardees will hire all the incumbent staff and/or staff any new positions by the time GAO reaches a decision in the protest. If GAO grants the protest, therefore, a Task Order award will not provide Oak Grove any relief at all as the staff requested by FSI in the RFQ likely will have already been hired by the Task Order awardees.

### 4. FSI Ignores The Impact Of Its Override Decision On The Integrity Of the Procurement System

In the D&F section entitled "Effect of the Stay of [sic] the Procurement System," FSI states the override will not preclude Oak Grove from competing for or receiving a Task Order pursuant to the RFQ should GAO sustain its protest. For this reason, FSI summarily concludes its override of the stay does not adversely impact the integrity of the United States' procurement system. Exhibit C at 7 ("Protester will have the ability to compete for the entire contract in the unlikely event that the protest is sustained").

FSI's cursory analysis misses the point.[4] As noted above, given the manner in which FSI intends to allocate work under the awarded Task Orders, FSI's override will be tantamount to awarding all the eLearning work contemplated by the RFQ to the two Task Order awardees. Once the awardees have hired all the incumbent and additional staff necessary, no more work will be awarded. See Reilly's Wholesale, 73 Fed. Cl. at 717 (noting that CICA's automatic stay is premised on the notion that "the failure of an agency to stay performance could result in a competitive disadvantage that might not be remedied, causing a contractor to lose an important business opportunity"). Furthermore, while FSI indicates that it would be willing to terminate the awarded Task Orders if GAO sustains the protest, it does not commit to doing so. Indeed, it is this ability of agencies to ignore GAO recommendations that prompted Congress to provide an automatic stay upon the filing of a timely protest. Congress intended the CICA stay to prevent the "*fait accompli*" of a contractor establishing a relationship with and knowledge of the agency long before the agency might be required to revisit the contract award. See E-Management, 84

---

[4] FSI's reasoning also seems to be based on its opinion of the merits of Oak Grove's GAO protest, a fact that is irrelevant to the justification for an override of a CICA-imposed stay. See PGBA, LLC v. United States, 57 Fed. Cl. 655, 658 (2003) (noting that "the Federal Circuit [has] determined that this court could review the merits of an override independent of any consideration of the merits of the underlying contract award"); see also E-Management, 84 Fed. Cl. at 9 (chastising the agency for relying on "its optimistic view of the likely outcome of the protest to discount the costs of the override").

Fed. Cl. at 6 (referencing H.R. Rep. No. 99-138, at 4-5); see also Advanced Sys., 72 Fed. Cl. at 30-31 ("The automatic stay is intended to preserve the status quo during the pendency of the protest so that an agency would not cavalierly disregard the GAO's recommendation to cancel the challenged award."). Given the agency's rush to override the stay with little justification and its failure to appreciate the different costs associated with a termination of the awarded Task Orders, ignoring GAO's recommendation for relief in a sustained protest is a distinct possibility in this case.

Finally, FSI's reasoning ignores the competitive advantage the Task Order awardees will have in any reprocurement or corrective action FSI may be required to take in the event GAO sustains the protest. A determination that the protester still will be able to compete is not enough to ensure the integrity of the procurement system. See CIGNA, 70 Fed. Cl. at 112-113. FSI claims that the Task Orders' scope of work includes new and expanded requirements. If the Task Order awardees begin to perform these new and expanded requirements they may well be in a better position to win a Task Order should FSI have to recompete the requirement, particularly since "Understanding of Work" is currently a key evaluation factor. Thus, the agency here failed to consider the fact that the override places Oak Grove at a competitive disadvantage in any reprocurement, an outcome the CICA stay was designed to avoid.

### B. Oak Grove Is Entitled to Injunctive Relief

To the extent the Court considers Oak Grove's request for relief under the traditional injunctive relief factors rather than the "arbitrary and capricious" standard and factors set forth above, the result is the same. By demonstrating that FSI's justification for the override is arbitrary and capricious, Oak Grove also demonstrates it likely will succeed on the merits of its challenge to the agency's override decision. See Superior Helicopter, 78 Fed. Cl. at 194-195.

00009800

18

Because the override will allow the Task Order awardees to hire all the staff necessary for performance of the RFQ requirements before GAO issues a decision in the protest, Oak Grove will suffer irreparable harm as a result of the override. See Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 571 (2000) ("a lost opportunity to compete on a level playing field for a contract . . . has been found sufficient to prove irreparable harm"). Oak Grove will also lose the opportunity to perform and receive revenue for the work performed by the two Task Order awardees should the override be upheld. This harm, moreover, outweighs the harm FSI states it will suffer if the new RFQ requirements are not implemented immediately into FSI's current eLearning program. Even if the harms to the United States FSI describes in the D&F are real, the D&F indicates FSI did not fully consider all reasonable alternatives to the override. Finally, the D&F does not sufficiently take into account the effect the override would have on the integrity of the procurement process. Without the stay, Oak Grove will have little, if any, chance to win work even if FSI decided to award it a Task Order. The override, therefore, eviscerates the very purpose of the automatic stay. The evisceration of such a fundamental enforcement regime authorized by Congress cannot serve the public interest.

## VI.    REQUEST FOR RELIEF

For the reasons set forth above, Oak Grove respectfully asks the Court to: (1) grant its motion and issue a temporary restraining order and preliminary injunction prohibiting FSI from authorizing performance under the awarded Task Orders until GAO issues a decision in the protest; (2) award Oak Grove the costs and expenses (including attorneys' fees) it has incurred in bringing this action and (3) award any other relief the Court believes is just and appropriate in this case.

Oak Grove also asks the Court to: (1) grant its motion and issue a declaratory judgment that FSI's determination to override the automatic CICA stay is arbitrary, capricious and lacks a rational basis; (2) set-aside FSI's override determination and reinstate the CICA stay during the pendency of Oak Grove's GAO protest; (3) award Oak Grove the costs and expenses (including attorneys' fees) it has incurred in bringing this action and (4) award any other relief the Court believes is just and appropriate in this case.

Dated:  August 27, 2014

Respectfully submitted,

Devon E. Hewitt (D.C. Bar No. 421515)

**PROTORAE LAW, PLLC**
8075 Leesburg Pike, Suite 760
Vienna, VA 22182
Telephone:  (703) 942-6746
Facsimile:   (703) 942-6758
dhewitt@protoraelaw.com

*Counsel of Record for Plaintiff*
*Oak Grove Technologies, LLC*

Of Counsel:

John H. Hawthorne
**PROTORAE LAW, PLLC**
8075 Leesburg Pike, Suite 760
Vienna, VA 22182
Telephone:  (703) 749-8507
Facsimile:   (703) 942-6758
jhawthorne@protoraelaw.com

Of Counsel:

James B. Kinsel
**PROTORAE LAW, PLLC**
8075 Leesburg Pike, Suite 760
Vienna, VA 22182
Telephone:  (703) 749-8507
Facsimile:    (703) 942-6758
jkinsel@protoraelaw.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | |
|---|---|
| OAK GROVE TECHNOLOGIES, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Case No. _____ |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR DECLARATORY RELIEF, A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

# APPENDIX OF EXHIBITS

## TABLE OF CONTENTS – APPENDIX OF EXHIBITS

**eLearning Devlopment and Services Solicitation Questions and Answer**.............Exhibit A

**Letter From Department of State Counsel**................................................Exhibit B

**FSI Findings and Determination**.......................................................….Exhibit C

**Excerpts From FSI Course Catalog**......……..….................................…....Exhibit D

**E-Mail From FSI Contracting Officer**..................................................…..Exhibit E

# EXHIBIT A

## SFSIAQ14R0002
## eLearning Development Services Solicitation
## Questions & Answers

1.  We do not have a facility clearance at the moment but we feel confident that we can obtain one with your agency sponsorship. Since the work is being performed at the US Department of State site, would it be possible for the contractor to obtain a facility clearance after being awarded the contract?
    No. The Offeror must have a facility clearance or approved interim clearance at proposal submission and award.

2.  Is the incumbent contractor qualified to compete for this contract?
    The incumbent is a large business and this requirement is set aside for small businesses only.

3.  Our recruiters are very capable of filling all the required positions on short notice. Given there are incumbent staff with the first right of refusal, any potential candidates we recruit at the time of proposal may not actually get the intended position. Would you eliminate the requirements of supplying 12 resumes?
    No.

4.  I wanted to re-confirm if this opportunity requires a "Secret Facility" Clearance.
    This solicitation requires a Secret Facility clearance.

5.  Could any large business sub to a Small Business on this opportunity?
    Yes.

6.  Is the incumbent eligible to rebid?
    See question #2

7.  This solicitation was posted for Schedule 70, but it is focused on Training which is also covered by Schedule 874.4. Even though we have both a Schedule 70 and Schedule 874, our 874 schedule has the requested training related labor category (e.g. Instruction Designer) which are not include on our Schedule 70.
    Please map position descriptions to all the companies' current GSA schedules.

8.  Section G. 6 notes that a Secret facility clearance is required. Would an interim clearance suffice to meet this requirement?
    An interim secret facility clearance would be accepted, only if an official Defense Security Service (DSS) memo was issued granting the company interim facility secret clearance. The DSS memo must be submitted with the proposal.

9.  Section G.6.a states that a facility security clearance is required in accordance with DD Form 2254. We are in in the process of waiting for Defense Security Services to approve our Secret level Facility Clearance request. The packet was updated on eFCL on 13 June 2014 and we are awaiting approval. We currently have a DD254 on a contract with

Defense Health Agency; a subcontractor on that contract holds our clearances for us. Would it be possible for us to continue to have that subcontractor hold our clearances until we receive our FCL approval?

No, the prime and any subcontractor must have the required secret facility clearance upon proposal submission and contract award.

10. Per Section C.12 and the recent amendment, we understand that the Government's intention is to award multiple fully loaded Labor Hour Task Order contracts. Can you please clarify whether the intent is to award a single contract with multiple task orders, or multiple contracts consisting of single Task Orders?

The Government intends to award multiple Task Orders against the GSA schedule.

11. On this contract, can a non-secret cleared SB contractor sub to a TS cleared prime and after the award, apply for secret clearance?

The prime and subcontractor must have the required secret facility clearance at time of proposal submission and upon contract award.

12. On this contract, can a Secret cleared Prime hold clearances of the employees of non-secret cleared SB teaming partner?

No.

13. Is current incumbent allowed to rebid as prime or sub on this contract?

Please see answer 6.

14. Page 18 of 93, Paragraph 1: States that the Government "intends to award multiple Fully Loaded Labor Hour Task Orders". How would the work requirements be split among multiple contractors (e.g., by labor category or other means)?

The results of the right of first refusal process will determine the division of labor categories between contractors. The Government does not intend to split contractors by labor category, but by individual staff within categories. The Government intends that individual project teams (i.e. a specific el-earning course or a specific technical effort) will be comprised of mixed contracts rather than each labor category being awarded to one contractor.

15. If multiple awards are expected, how many awards are anticipated?

The Government intends to award up to three Task Orders.

16. Page 18 of 93, Paragraph 3: Requires the Contractor to provide both unloaded labor hour rates and fully loaded labor hour rates. The pricing sheets on pages 5-18 do not specify which rates are to be provided. Please provide instructions on where each type of rates is to be provided.

Please provide the fully loaded labor hour rates in section B (pg. 5 - pg. 18). Please provide both fully loaded labor hour rates and unloaded labor hour rates in section B.3.

17. Page 39 or 93, Paragraph 7: States that "The recipient shall retain and compensate the existing FSI/EX/ISD contract employees to the maximum extent possible."

    a. Page 90 of 93, Paragraph 5: References "compensation levels lower than predecessor contractors". In order to comply with these requirements, bidders will need to know the rate structure of current contract/task order(s). Please provide that information.
      FSI cannot not provide this information.

18. Is the Government open to post-award negotiations to ensure our ability to retain incumbent contractor personnel? This may include increasing and/or decreasing rates to meet Government objectives.
The Government does not intend to open post-award negotiations.

19. Page 56 of 93, Paragraph 6(c): Which individuals/labor categories are exempted from the requirement to possess SECRET security clearances?
We anticipate the need for at least one secret cleared individual per labor category.

20. Page 91 of 93: States a requirement for Past Performance Questionnaires. Please provide copies of the Questionnaire and instructions for respondents.
The Past Performance Questionnaire is posted on GSA e-Buy.

21. Page 91 of 93: States that "the Offeror shall identify six (6) contracts/task orders ... that demonstrate recent and relevant past performance." Later on that same page, it states that the Past Performance Questionnaire shall be provided to "the three entities described above..." Please clarify whether three or six past performance questionnaires are to be provided.
A minimum of two of the six past performance examples must be from the prime contractor. It is critical to demonstrate that the prime contractor is ready and able to assume all duties if necessary. This change is reflected in Amendment: (A002)

22. Page 91 of 93, Price Proposal: References prices for (a) base period, (b) all option periods, and (c) six-month extension period. Please provide instructions on how/where bidders are to submit rates for the six-month extension period.
For purposes of determining the evaluated price for the six month 52.217-8 extension, the total price is calculated as one-half of the total price of the final option year.

23. Page 85 of 93: states that the minimum font size to be used for proposal text is Times New Roman 10 point. However, Page 92 of 93 states that the minimum font size is Times New Roman 12 point. Please clarify.
FSI requires the font size to be Times Roman 12 point. This change is reflected in Amendment: (A002).

24. Is it acceptable to the Government for a small business prime contractor to bid with a large business as subcontractor?
Yes.

25. Proposals are due Monday, July 7th following the Independence Day holiday weekend. We respectfully request the due date be extended by one week, to Monday, July 14th to

enable bidders to use FedEx or other delivery service that would require us to send it out the Friday before the due date. In this case, that would mean sending it out on the 4th of July.
No extension will be processed at this time.

26. Under Section 6, "Key Personnel", of the solicitation, it states that "The individual selected for these key personnel positions (Key Program Manager and Alternate) must be an employee of the Prime Contractor." We respectfully suggest that the Government consider allowing the Alternate Program Manager to be an employee of a major subcontractor.
The requirement will remain unchanged. The Key Program Manager and Alternate must be an employee of the Prime Contractor.

27. Under Section 3: In light of the fact that this procurement has been released under GSA IT Schedule 70 as a Fully Loaded Labor Hour Task Order Award, can you please provide clarification on the request for unloaded hourly rates which could be considered cost and pricing data? Particularly considering potential Offeror rates under GSA Schedules are government-approved and considered reasonable.
Considering the evaluation of the compensation package, we would like to have an unloaded rate presented that does NOT include such packages and the fully loaded rate would include all factors contributing to the offerors rates.

28. Under Section 9: "Offers", the solicitation states "Offers have a 30 page limit excluding resumes for Volume I". We respectfully suggest that, in order to ensure that offerors are able to provide enough information on all solicitation requirements, that the Government consider exempting the Past Performance write-ups from the 30 page limit.
Past Performance write-ups will not count toward the 30-page limit.

29. Does FSI intend that this solicitation will be award to one contractor?
Please see section B.1.

30. Page 18, Section 3: Procurement Specific states "Contractor shall provide the unloaded labor hour rate proposed for each individual and the fully loaded labor hour rate (including overhead, profit, employee compensation, etc.) to support the Foreign Service Institute's Instructional Support Division as outlined in Section C.". Please confirm that the Government means for each individual labor category. If not, please clarify the Government's intent.
Please provide rates as specified in sections B and B.3.

31. Page 48, Sections 4, 5, 6 state that the Contractor shall implement these plans "developed as part of its proposal". Is it the Government's intent that these Plans (QASP, Section 508 Testing & Compliance, Management and Communications Plan) be delivered as part of the proposal submission or be delivered after award?
The contractor's proposal will be incorporated as part of the award. These parts must be submitted at proposal submission.

32. Page 56, Section 6: Security Requirements states that Contractor personnel assigned to this Trask Order Shall possess SECRET personnel security clearances issued by Defense Security Service (DSS) prior to contract performance. However, on Page 24, Section 2, Assumptions states that Contractor staff shall have the ability to obtain interim or active public trust or Secret clearances, depending on the requirements of the position and as requested by the Government. Which labor categories require contractor staff to have a specific interim or active public trust or Secret clearance at the time of contract award?
The list of incumbent personnel and their perspective clearance level will be provided at the time of right of first refusal.  Secret clearances are held in a variety of labor categories: approximately one per labor category.

33. Page 57, Additional Security Requirements states that Subcontracting firms must possess facility security clearances commensurate with their level of access.  If the subcontracting firm does not require or intend to access from their facility is any facility clearance required for the subcontractor?
Yes, the Prime and any subcontractor would need to have at minimum a SECRET facility clearance whether contract performance is at their facility or at government building. If a secret cleared incumbent personnel or new staff is required by FSI, the company employing the personnel must have a secret facility clearance.

34. What is the duration of the transition period for the incumbent per the terms of the current contract?
The incumbent contract will end on 09/15/2014 and the new award(s) will start on 09/16/2014.

35. How many new courses are expected to be created annually?
Up to fifteen new courses, twenty substantial version updates, and sixty maintenance updates

36. Section L_ Formatting: Page size 8.5 by 12 inches with 1 inch margins.  Should this by 8.5 by 11 inches?
Yes - standard letter size (A002).

37. Section M Evaluation Factor 2_ The Offeror shall identify six (6) contracts/task orders with the Federal Government and/or commercial customers that demonstrate recent and relevant past performance. Would the government consider accepting up to six references? Would the government also accept less than 3 from the prime contractor without penalty?
See question #22.

38. Section M Oral Presentation_ What is the format of the oral presentations?  How much lead time will be given in scheduling?
The Oral presentations will be conducted at FSI with the optional use of a working demo (using CD or internet).  Lead time will be approximately three business days.

39. Reference: Page 49, paragraph #1 under Section 8 'Government Closure' states "Should the Federal Government of the Department of State, Foreign Service Institute, close for any reason (e.g. snow storm, terrorist threat, emergency situation, etc.) and the contractor is unable to perform services, the contractor shall not be paid for that day. If approved by the Contracting Officer and Contracting Officer representative the hours lost can be rescheduled and the contractor can be given an opportunity to provide services on a new date".

    a. Can the Government provide timeframe for the approval of rescheduling days lost due to government closures (specifically whether and how far in advance the contractor will be notified)?
This timeframe is determined on a case by case basis. The Government will not list a pre-determined timeframe.

    b. Given that proposed staff will be salaried employees whom the Contractor will pay in the event of a work cancellation for factors outside their control despite being unable to bill for their time, can the Government advise how pricing should be done to account for potential lost billing days?
The Government intends to obligate 1880 hours for each position; if the hours are not expended or rescheduled the hours will be de-obligated. The Government cannot advise on how pricing should be done to account for potential lost billing days.

    c. Should the bidder price a certain number of 'snow days' into rate calculations? If so, how many?
Under the company's discretion.

40. Reference: Page 89, item #4 under 'Business Approach and Technical Capabilities' (Section M) it states "the foreign Service Institute (FSI) maintains a course library of over 270 custom courses. Maintaining technical compatibility with ever more frequent browser updates is a concern"

    a. Can the Government identify the authoring software for the 270 custom courses?
Custom-coded html with some commercial off-the-shelf emulation software and authorware.

    b. Can the Government identify the platform on which the 270 custom courses are currently hosted?
Customization of learn.com

    c. Can the Government provide the number of courses that are SCORM compliant?
Approximately 250

    d. Can the Government provide the number of courses that are Tin Can API compliant?
None currently

41. Reference: Page 90, paragraph #1 under Sub-factor 3: Compensation Plan states the compensation levels proposed should reflect a clear understanding of work to be performed and should indicate the capability of the proposed compensation structure. . . Additionally, proposals envisioning compensation level lower than those of the predecessor contracts for the same work will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees"
    a. Given the emphasis in the RFP on bidder's ability to retain existing personnel and the fact that proposal comparisons between the bidder salaries and the incumbent salaries will be an evaluation factor, can the government provide current salaries or salary ranges for all positions listed in the RFP?
       No.

42. Reference: Page 56, under section 6 'Security Requirements', last paragraph states "Contractor personnel assigned to this Task Order shall possess SECRET personnel security clearances issued by Defense Security Service (DSS) prior to contract performance, except those individuals specifically designated by the Contracting Officer's Representative (COR) to perform only on unclassified portions of the Task Order and/or in areas not requiring cleared access. On page 39, the end of the first paragraph states "both, the Key Program Manager and the Alternate Key Program Manager will require a Secret clearance" On page 24 under section 2 'Assumptions' it states "Contractor staff shall have the ability to obtain interim or active public trust or Secret clearances, depending on the requirements of the position and as requested by the Government."
    a. Question #9: Given the different salaries expected by personnel with secret versus public trust clearances, and/or costs associated with obtaining such clearances, can the Government clarify which positions will be required to have Secret clearances and which will be required to have public trust clearances?
       All positions are required to have public trust clearances; we anticipate the need for at least one secret cleared individual per labor category.

43. In Section M, Evaluation Factor 2, Sub-factor 2, Past Performance and Performance Metrics, the government states that the six contracts provided as past performance should contain 3 from the prime and three from the subcontractor/partner. Does the government mean that if the team consists of more than one subcontractor, each subcontractor on the team must submit 3, which would make the overall total greater than 6?
   At least two of the six should come from the prime contractor, regardless of number of sub-contractors and the remainder may come from any combination of sub-contractors, with a minimum of one past performance example per each sub-contractor. This change is reflected in amendment A002.

# EXHIBIT B

August 22, 2014

VIA ELECTRONIC MESSAGE

Office of General Counsel
United States Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548
ATTN: Heather Weiner

Re:  B-410323, In the Matter of: Oak Grove Technologies, LLC; Notice of
performance of award stay override

Ms. Weiner:

This letter serves to notify the Government Accountability Office, as required by 31
USC § 3553, that the head of the contracting activity has determined to authorize
performance of award during the pendency of this protest. A copy of the head of
contracting activity's findings and determination is attached herewith.

Sincerely,

Morgan L. Cosby
Attorney Adviser
Buildings and Acquisitions
CosbyML@State.Gov
703-875-5266

CC: With enclosure, via electronic message
Counsel for protester:
Devon E. Hewitt, dhewitt@protoraelaw.com

# EXHIBIT C

**FINDINGS AND DETERMINATION TO SUPPORT CONTRACT
PERFORMANCE DURING POST-AWARD PROTEST TO GOVERNMENT
ACCOUNTABILITY OFFICE
PROTEST OF OAK GROVE TECHNOLOGIES, LLC**

Upon the basis of the following findings, I have determined that it is in the best interests of the Government for the Department of State (DOS or Department) to continue performance in light of the General Accountability Office (GAO) protest docketed as B-410232 filed by an unsuccessful offeror, Oak Grove Technologies, LLC under Solicitation SFSIAQ14R0002 for the Instructional Support Division eLearning Development Services requirement. As a result of the protest filed at the GAO on August 14, a stop work order was issued to the selected contractors, Coley & Associated, Inc. (Coley) and The Ventura Group, Inc. (Ventura). Upon consideration of the best interests of the United States Government ("USG" or "Government"), I have determined it to be in the best interest of the USG to override the automatic stay. Pursuant to my authority as Head of the Contracting Activity pursuant to 31 U.S.C. §§ 3553(d)(3)(C), FAR 33.104(c)(2)(ii) and DOSAR 601.603-70(a)(4), I hereby make the following findings and determination in support of this determination:

## Background of Contract Requirement

The Foreign Service Institute's Instructional Support Division (FSI/EX/ISD) works with FSI schools, Department of State bureaus, and other federal agencies to design and develop custom web-delivered eLearning multimedia courses, products, materials, and related services.

The awarded Task Orders shall provide eLearning development services for ISD's custom eLearning design and development program. It replaces and expands new requirements the incumbent Blanket Purchase Agreement (BPA), which expires COB, September 15th 2014. The task orders under the BPAare to field an expanded eLearning team to support ISD's instructional support mission beginning opening of business (OOB) September 16th 2014.

FSI/EX/ISD is the Department's sole provider of custom eLearning courses. Over the past fifteen years, FSI/EX/ISD has designed and developed approximately 300 eLearning courses and products, 275 of which are currently maintained and available 24/7 to a worldwide audience. The courses respond to Department mandatory training requirements and identified training needs. The overwhelming majority of live courses are not available in an alternative format for Department and other agency employees. Additionally, FSI/EX/ISD must respond to ongoing and often urgent eLearning course development requests and provide maintenance to current courses on a continuous basis in order to meet the eLearning training demands of the entire Department and the greater Foreign Affairs Community. Accordingly, it is critical to the business of the USG that FSI/EX/ISD provide eLearning development services without interruption. Our Task Orders for eLearning development services is what enables us to maintain uninterrupted

1

services, so it is critical that these services transfer seamlessly from the conclusion of the current BPA to the commencing of the ongoing and new requirements under protested BPA.

**Schedule Delays and Prior Protests**

Upon completion of the evaluation of technical, oral presentation and price proposal, the Department made its selection of Coley & Associates, Inc. (Coley) and The Ventura Group, Inc. (Ventura) as representing the best value to the Government on August 05, 2014. One (1) of the five (5) unsuccessful offerors protested the award decision at the Government Accountability Office (GAO). Oak Grove Technologies filed its protest on August 14, 2014, which resulted in an automatic stay of performance in accordance with 31 U.S.C. § 3553. GAO's Decision in Oak Grove Technologies' protest is due on or before November 24, 2014.

**Effect of the Stay on the Project**

These Task Orders shall provide eLearning development services for ISD's custom eLearning design and development program. The custom eLearning design and development program has been in place for fifteen years at FSI and supports Department of State Strategic Goals as well as the FY2014-2016 IT Strategic Plan.

ISD works with FSI schools, Department of State bureaus, and other federal agencies to design and develop custom web-delivered eLearning multimedia courses, products, materials, and related services The effect of the stay on these Task Orders would negatively impact the FSI custom eLearning design and development program in the following ways:

- Of the six deliverables cited on pp.44-46 of the performance work statement of the solicitation, five are requirements that have been expanded from the expiring BPA and one is an entirely new requirement. Programmatic changes at FSI have prompted these additions, the following of which are not part of the expiring BPA and therefore cannot be met by a period of performance extension of the BPA:

  o Contractor shall provide personnel to support ISD legacy tools and Sharepoint knowledge management; required as a response to an OIG recommendation to the Bureau

  o Significant new sub-requirements to the Instructional Design requirement in order to respond to Bureau mandates to provide more remotely accessible and interactive courseware not possible under the expiring BPA: synchronous training, mobile and responsive design, gaming and simulation, blended learning design and use of social media applications

2

- o Key new sub-requirements to the eLearning Development Services requirement such as responsive web design for mobile devices, use of eBooks, and business analysis to liaison with the learning management system team

- o Formal tracking of legacy course maintenance in a database

- o Provision of Level II and III Help Desk support

- Three new positions not provided in the expiring BPA – Senior Technical Analyst, eLearning Business Analyst III and Business Analyst III – are necessary to meet the new requirements above. Additionally, a vast majority of the position descriptions on pp. 27-28 of the performance work statement of the solicitation have alterations to their requisite experience updated from their corresponding positions from the prior BPA to align in with the new and/or expanded service deliverables listed above. Therefore, even those positions with corresponding positions on the expiring BPA cannot necessarily be carried forward from the expiring contract to meet the new requirements, deliverables and position duties.

- Without sustained provisions of eLearning services which requires a replacement of the expiring BPA, technical operability of current 275 course portfolio would be compromised. ISD must swiftly update the portfolio when the Department implements updates to State Department build Microsoft products. As an example, ISD must retrofit and update up to 50 courses in the current portfolio to conform with the IE11 build.

- Thirty additional eLearning courses and projects in various stages of design, development, delivery would not be delivered to stakeholders upon committed launch date. Additionally, the new requirements which will be met by the new Task Orders will change the scope of courses currently in development, requiring retroactive refitting of these new courses in order to meet the new requirements which will ultimately cause the USG to expend more funds over the long run.

- eLearning courses, products and services timed for committed delivery to coincide with SLS student starts would not be delivered which could jeopardize FSI's intended training program for the fall, particularly in high priority language training.

- eLearning courses responding to federal rule changes and aligned with Federal and Department training and awareness reporting requirements would not be delivered (i.e. OMB Grants Rule Change and FLSA standards)

Delaying this could detrimentally affect the program office's ability to progress the courses offered in support of the Government's diplomatic mission. Proper planning and coordination at the start of the project greatly reduce the risk of potential problems and failures as the actual hard implementation and coordination work begins.

**Basis for the Override**

3

I find that commencement of eLearning development services by Coley and Ventura is in the best interest of the USG and that the non-delivery and undue delays the design and maintenance of the Department's entire custom eLearning suite affects the interests of the USG that will not permit waiting for the GAO's decision on the protest. A further delay in the commencement of this project will result in an equal delay in the completion of key eLearning projects delineated above. As discussed herein, the impact of further delay to the continuation of eLearning development program carries significant risks for the Department in both in cost to the USG and implementation of a new progressive ISD program. I have considered the following in making this assessment:

- The ability to proceed with multiple eLearning development projects and not lose another 90 days would make the risk well worth the effort to ensure continuity of this program. In the event that the Task Orders requires termination for convenience as a result of an adverse GAO decision, the costs to the Government will be limited to $ 1,427,746.56. or less, as Coley and Ventura will only have been authorized to proceed with the first 48 days of Task Order performance. Despite these potential costs, it is still in the best interest of the Government to proceed with continuation of the program by commencing with the awarded Task Orders as achievement of continued maintenance of our current 275 course and timely completion and multiple courses requested by Department clientele far outweighs the potential cost in the event of termination.

- Continued performance under the Task Order requirements will provide benefits to the program and to the Government that will better assure successful project completion within budget constraints. It does not prejudice the project/protest or cause undue burden on the Government or interested parties should GAO sustain the protest.

- Because this is a multiple award contract, in the event the protest was sustained and upon re-evaluation, Oak Grove Technologies was consider among the best valued offerors, an award could be made to Oak Grove without disrupting the awards to the 2 current awardees. The Department is additionally prepared to terminate its Task Orders with Coley and Ventura and potentially lose the money invested in the design and development work in the unlikely event that the protest is sustained and the award to Coley and Ventura invalidated. As noted above, immediate commencement of the project is critical to the needs of the Department and the Department has determined that the risks of further delay outweigh the potential cost impact if the Department is forced to terminate Coley and Ventura Task Orders as a result of the GAO Decision on or before November 24, 2014.

**Lack of Feasible Alternatives**

Due to the changing requirements/direction and differing position titles and assignments/duties, there are no feasible alternatives to providing alternate custom eLearning design and development services to both maintain current portfolio and

4

respond to new and often urgent requests for additional eLearning courses and products. These custom courses and products must conform to the Department security, technical and legal rules and regulations. In addition, the new scope areas of eBooks, mobile, simulation, webcasts, and blended courseware are not specifically listed in in the current BPA and were added to the new PWS. Traditionally, an extension of a contract is to not displace the status quo or require multiple transitioning. Because there are extensive new requirements under this BPA, paired with the fact that this is a multiple award BPA and the current awards would not have to be invalidated, per se, if Oak Grove's protest is successful, therefore, it is in the best interest of the government to proceed with performance by the two awardees who have proposed on the new requirements. This will allow the transition on September 16 to go forward smoothly, not disrupt classes or services, provide the new requirements, and not result in additional costs for transition or significant harm to the protester, as discussed further below, it would still, if re-evaluation resulted in award, have opportunity to receive a contract and perform on the award. Therefore, all things considered, an extension to the current BPA would not be in the best interest of the Government.

For Example, the current BPA's Statement of Work is entitled *Distance Learning Development team, Professional Training and Foreign Language **Courses***, [bold added here for emphasis]. The objective states:

> *The purpose of this RFP is to provide instructional design, interface development, programming and Quality Assurance specialists to fulfill the tasks described in this document for the FSI Executive Office, Instructional Support Division (FSI/EX/ISD). The contractor must be prepared to deliver one or more staff members in each of the positions below with a secret clearance, if required. The work described above in the background section cites customized, web-delivered Distance Learning courses.*

The PWS for the new Task Order includes the above, but makes several additions in its Scope section:
- The Instructional Design Section (section 3a) expands the scope to blended courseware (designing instructional solutions that have web-based courseware to accompany, or be integrated into instructor-led sessions.) Simulation-based and Mobile training are also added;
- Expertise with eBook technology was added to section 3b address changing needs and new technologies. This section also adds technologies as webcasts that were not included in the Scope of the old BPA;
- The HTML 5 and Tin Can API are new technologies that have been added to section 3d.

Furthermore, the current BPA specified one delivery method: *through the FSI LearnCenter.* However, the new PWS specified multiple delivery methods in section 3b: *Products include self-paced asynchronous training delivered via a learning management system, blended learning to include Adobe Connect webcasts, asynchronous wikis, SharePoint, discussion forums, and other collaborative technologies.*

5

The above points were added to the PWS to support the following:
1. The Department of State IT Strategic Plan, which establishes a goal of Mobile Diplomacy (increased use of mobile technology), increased use of computer based training for Workforce Development and training, and continuous innovation and innovative solutions for Digital Diplomacy.
2. A focus by FSI Leadership on new and innovative technologies for teaching and learning, such as webcasts, mobile learning, simulation-based training, and exploring the use of new technologies (such as e-books.)

**Merits of the Protest Issues:**

The Department thoroughly evaluated proposals and oral presentations consistent with the Solicitation. The Acquisitions Office made a thorough and reasoned best value decision that included considerations of the trade-offs between cost and technical factors. In selecting Coley and Ventura, the acquisitions team specifically considered whether Coley and Ventura's technically excellent proposals and superior oral presentations were worth the payment of a price increase of 1.67% (Compared to Coley's price proposal) over Oak Grove Technologies' proposal and concluded that such a premium was warranted. The evaluation record, including the award determination, is well-documented and reasonable and in full compliance with applicable law and regulation.

Upon review of the protest allegations, the FSI does not consider the allegations to be meritorious and its review has not revealed any procurement errors.

**Effect of the Stay – Harm to the Department vs. Harm to Oak Grove Technologies:**

A stay would harm the Government in the following ways:

1. A stay would compromise the technical operability of all current custom eLearning courses and projects in various stages of design, development and delivery would not be delivered to stakeholders upon committed launch date.

2. As a result, eLearning courses, products and services timed for committed delivery to coincide with SLS student starts would not be delivered which could jeopardize FSI's intended training program for the fall, particularly in high priority language training.

3. The Government would also be harmed beyond the scope of just DoS as eLearning courses responding to federal rule changes and aligned with Federal and Department training and awareness reporting requirements would not be delivered, eLearning Cybersecurity courses designed for other federal agencies and entities under the Information System Security Line of Business would not be delivered (with no viable alternates means) and mandatory eLearning courses (Counter Intelligence, CyberSecurity, Passport Data Security Awareness) completed by up to 100,000 users annually would not be delivered. Non-completion may result in user deactivation from

6

Department computing and application systems.

4. A potential harm to the welfare, health and safety of those at Post is that eLearning crisis management, evacuation management and emergency preparedness courseware for worldwide Department audiences would not be delivered.

5. The newly identified requirements, positions, and agenda of the program would be compromised, possibly costing the Government more money in the future. This would also set the timeline back on updating older courses to provide a more efficient and effective training apparatus for all agencies involved with FSI.

There will be no prejudice or harm to Oak Grove Technologies as a result of the Department's commencement of the Task Orders. To the extent GAO sustains the protest, this determination to commence Task Order performance will not preclude the Department from terminating the Coley and Ventura Task Orders for convenience and will not preclude Oak Grove Technologies from a subsequent opportunity to compete if GAO's recommendations require a subsequent corrective action. Further, as this is a multiple award BPA, the protester is not precluded from receiving additional award without requiring the termination of the other awards. Accordingly, the harm to the Department in delaying Task Order performance is significant due to failure to delivery timely and provide valuable and integral training to the DoS and US Government, while the protester would not be precluded from receiving award and perform on the remainder of the contract, and thus, suffer minimal harm that does not outweigh the harm to the government.

**Effect of the Stay of the Procurement System:**

Given the time required to move through the GAO process of 100 days, and in the instance that the protest is sustained to thoroughly re-evaluate proposals and oral presentations, it is now in the best interest of the Department to proceed with the Task Orders performance during the pendency of the subsequent protest.

In considering the impact on competition, I have carefully weighed the Department's mission requirements and the need to complete the eLearning development services and course maintenance in accordance with strict time constraints against the integrity of the procurement system. In this instance and in authorizing the start of performance, the Protester will still have the ability to compete for the entire contract in the unlikely event that the protest is sustained.

To the extent GAO sustains the protest, this determination to commence Task Order performance will not preclude the Department from terminating the Coley and Ventura Task Orders for convenience and will not preclude Oak Grove Technologies from a subsequent opportunity to compete if GAO's recommendations require a subsequent corrective action. Accordingly, the harm to the Department in delaying Task Order performance is more tangible than harm that may occur to competition in the procurement at issue.

In the unlikely event that the protest is sustained, the Department would implement corrective action as necessary. Which would include a re-evaluation of the Protester's proposal, and should the Department determine it was among the best valued offers could make award to the protester without displacing the current awardees, thus would not necessarily require the termination of the Coley and Ventura Task Orders for convenience as a result of an adverse GAO decision, though the Government is prepared to pay the costs to the Government would include the costs associated with the design, development and maintenance efforts. These anticipated costs are estimated at $1,427,746.56 for the first 48 days of Task Order performance. Notwithstanding this potential cost, it is still in the best interests of the Government to proceed with performance. This stay causes instability to the programmatic needs of FSI and support of all eLearning Development services. The continuity of operation under the new awarded Task Orders are paramount to the stability and quality of eLearning projects offered by FSI.

## DETERMINATION

Based on the Findings set forth above, I hereby determine that authorizing Task Order performance by Coley& Associates, Inc. and The Ventura Group, Inc., while the protest of Oak Grove Technologies, LLC is pending, is in the best interests of the United States Government. Further delay in the commencement of these services will significantly affect the interests of the United States and will not permit waiting for GAO's decision on the protest.

_Mart Rea_
Martin Regan
Head of Contracting Activity
Foreign Service Institute
United States Department of State

_8/22/2014_
Date

# EXHIBIT D



2014
2015



# Foreign Service Institute
# Course Catalog
## October 1, 2013 - September 30, 2015

U.S. Department of State
George P. Shultz National Foreign Affairs Training Center



Visual Diplomacy: Engaging Audiences Through Photos and
    Video, PY462 .................................................................142
  Writing for the Media, PY433 ..........................................142
Regional Training Programs
  Foreign Service National Leadership, RP401 ...............143
Security
  Active Defense: An Executive's Guide to Information
    Assurance, PS830 ........................................................143
  Cyber Security Awareness, PS800 .................................144
  Domestic Emergency Management, PD538 ...................144
  Information Sharing Environment, EX200 .....................144
  Personal Identity Verification Module 2, PS820 ...........145
  Security Overseas Seminar, Advanced, MQ912 ...........145
Training Skills
  Writing Specific Objectives, PD551 ...............................145

## Diversity
Basic EEO Counselor Training, PT171 .............................146
EEO Counselor Training Refresher, PT173 ......................146
EEO/Diversity Awareness for Managers and Supervisors,
  PT107 ...............................................................................146
Leading in a Diverse Workforce, PT218 ...........................146
Valuing Diversity in the Workplace, PT225 ......................147

## Economic and Commercial Studies
Economic Courses
  Economic Issues, PE285 .................................................148
  Foreign Service Economic Studies, PE350 ...................148
  Foreign Service National Economic Training, PE220 ....149
  Political/Economic Counselor Seminar, PE300 .............149
  Political/Economic Tradecraft, PG140 ...........................149
Environment and Resource Courses
  Biotechnology and Global Challenges: Trade, Food Security,
    Energy and Climate Change, PE150 ...........................150
  Coal and Power Technology, PE137 ...............................150
  Environment, Science, Technology and Health for Foreign
    Service Nationals, PE221 ............................................150
  Environment, Science, Technology and Health Tradecraft,
    PE305 ............................................................................151
  Global Health Diplomacy, PE152 ...................................151
  Hub Officer Orientation, PE292 .....................................151
  Petroleum and Gas Industry, PE127 ..............................151
  Washington Energy Seminar, PE228 ..............................152
Trade Investment and Commercial Training
  Commercial Tradecraft, PE125 ......................................152
  Intellectual Property Rights, PE138 ..............................153
  Telecommunications Industry, PE131 ............................153
  Trade Agreement Monitoring and Implementation, PE222 ...153
  U.S. Global Investment Policy, PE266 ...........................154
  U.S. Role in Multilateral Development Banks, PE264 ....154
Miscellaneous Courses
  New Approaches to Addressing Corruption, PE160 .......154
  Terrorism Finance and Economic Sanctions, PE141 .....155

## Global and Multilateral Issues
INL Orientation Workshop, PP218 ...................................156
International Terrorism: Understanding the Threat and Formulating
  the Response, PP521 .......................................................156
Labor Officer Skills, PL103 ..............................................157
MEPI Coordinator, Administrator and Project Officer Training,
  PP350 ...............................................................................157

Multilateral Diplomacy, PP211 ........................................157
Policy Priorities in Multilateral Diplomacy: The Prevention of
  Genocide and Mass Atrocities, PP230 ...........................158
Promoting Human Rights and Democracy, PP530 ..........158
Religion and Foreign Policy, PP225 ................................159

## Language Studies
General Information ...........................................................160
Course Codes and Program Codes ..................................161
Language Codes ................................................................161
Domestic Programs
  The Basic Courses: Long-Term Language and Area Studies,
    L_100 .............................................................................162
  The FAST Courses: Familiarization and Short-Term Language
    Studies, L_200 .............................................................162
  Early Morning, L_300 ......................................................163
  Intensive Language Conversion Course, LPY111 .........163
  Refresher Courses, L_201 ..............................................164
Advanced Training
  Beyond-Three Training, L_101 .......................................164
Overseas Programs
  Overseas Advanced Training – The Field Schools, L_950 ....164
Distance Learning
  Distance Learning ...........................................................165
Consultations
  Consultation: Learning Styles Diagnosis .......................165
  Consultation: Learning Styles Diagnosis Follow-up
    Appointment .................................................................165
Testing
  Language Testing ............................................................165

## Leadership/Management
Ambassadorial Seminar, PT120 .......................................167
Bureau/Mission Offsites, PT130 ......................................167
Civil Service Mentoring Workshop, PT132 ......................167
Coaching, PT229 ...............................................................167
Communicating with Congress: Briefing and Testifying,
  PT302 ...............................................................................168
Creative Problem Solving, PT212 ....................................168
Crisis Leadership, PT303 .................................................168
Crisis Management Exercise, Overseas, PD533 .............168
Crisis Management Military Exercise, Advanced, PD535 ...169
Crisis Management Overview, Overseas, PD534 ............169
Crucial Conversations, PT150 .........................................169
Deputy Chiefs of Mission/Principal Officers Seminar, PT102 ...170
Effective Feedback Skills, PT256 ....................................170
Employee Relations Seminar, PK246 ..............................170
Fundamentals of Supervision, PT230 .............................171
High Stress Assignment Outbrief Program, MQ950 .......171
High Stress Assignment Outbrief Program—Special Session,
  MQ951 ..............................................................................172
High Stress Assignments, Pre-Deployment Preparation for,
  MQ940 ..............................................................................172
High Stress Posts, Working with Returnees from, PT450 ...172
Influence by Design, PT224 .............................................173
Leadership Skills, Advanced, PT210 ...............................173
Leadership Skills, Basic, PK245 ......................................173
Leadership Skills, Intermediate, PT207 ..........................174
Leading at a High Threat Post, PT250 ............................174
Leading Organizations through Change, PT308 .............175

# Leadership and Management School

## Crisis Management Training

Crisis Management Training Division train U.S. government employees and teams operating within the foreign affairs community to effectively plan for and respond during, and after crises. Crisis Management Exercises are conducted at over 100 posts annually and assist posts to actively test and validate their planned response to crises using available resources, State Department doctrine (12 FAH-1) and the post-specific Emergency Action Plan in a no-fault setting. An Emergency Action Committee distance-learning course developed by CMT allows EAC members and others to gain a better understanding of their roles and responsibilities in a crisis. The CMT team provides crisis management training embedded in domestic FSI tradecraft courses and offers a stand-alone crisis leadership class. In addition, CMT coordinates the Department of State participation in U.S. Marine exercises and collaborates closely on crisis management related topics and programs with various Department offices and U.S. government agencies.

## Executive Development Division

The Executive Development Division team facilitates the success of Civil and Foreign Service managers and leaders in executive positions and those who aspire to these positions. EDD's classroom training includes senior mandatory leadership courses *PT133 Senior Executive Threshold Seminar*, page 178, *PT102 Deputy Chief of Mission/Principal Officer Seminar*, page 170, and *PT120 Ambassadorial Seminar*, page 167, as well as an array of topic-specific courses, such as conflict management, managing diversity, team leadership and many others. In addition, customized workshops can be developed to fit the specific needs of overseas missions, or domestic offices. Consulting services include coaching high potential executives to achieve specific professional or organizational goals.

## Leadership Training Division

The Leadership Training Division team develops the management and leadership capabilities of mid-career Civil and Foreign Service employees. Courses range from first-time supervisory skills to the mandatory Basic, Intermediate and Advanced Leadership Skills training programs, as well as a number of short courses. LTD training emphasizes leadership awareness, influencing others, team building, negotiating, performance management, effective interpersonal skills and professional development of subordinates. LTD staff members also conduct customized training programs, facilitate offsite events, and provide a range of organizational development and coaching services.

## Policy Leadership Division

The Policy Leadership Division provides advanced professional development, policy discussions and networking opportunities to rising and senior leaders in the Department of State and other agencies in the foreign affairs/national security community. Designed to enhance individual work, organizational performance, and the interagency process, PLD offers a menu of programs and services varied in length and tailored to the needs and schedules of civilian and military leaders. PLD's leadership programs include *PT330 National Security Executive Leadership Seminar*, page 177, *PT331 Understanding the Interagency: A Primer for National Security Professionals*, page 180 and advanced training in techniques and strategies to present briefings and testimony to Congress. In addition, PLD offers one-day policy roundtables at the request of the senior leadership of bureaus designed to address mid- and long range policy challenges.

## Mandatory Leadership and Management Training

Leadership training from mid- through senior-grade levels is mandated to ensure that employees have the necessary preparation for increasing levels of responsibility. LMS offers courses to meet these mandatory training requirements.

The Basic, Intermediate and Advanced Leadership Skills Seminars are one-week courses based on OPM leadership competencies and Foreign Service promotion precepts. The *PT133 Senior Executive*

**Leadership and Management School (FSI/LMS)**
703-302-6743

**CRISIS MANAGEMENT TRAINING (FSI/LMS/CMT)**
703-302-7398

**EXECUTIVE DEVELOPMENT (FSI/LMS/EDD)**
703-302-7194

**LEADERSHIP TRAINING DIVISION (FSI/LMS/LTD)**
703-302-7199

**POLICY LEADERSHIP DIVISION (FSI/LMS/PLP)**
703-302-7117

*Threshold Seminar*, page 178, is a two-week seminar for all newly promoted OC and SES officers in the Department, and is to be completed within the first year after promotion into the senior service. It is the final rung of the mandatory portion of FSI's leadership and management training toolkit. Finally, the toolkit includes *PT107 EEO Diversity Awareness for Managers and Supervisors* training, page 146, mandatory for all managers and supervisors.

Mandatory Courses:
*PK245 Basic Leadership Skills*, page 173 (FS-3, tenured FS-04, GS-13)
*PT207 Intermediate Leadership Skills*, page 174 (FS-2, GS14)
*PT210 Advanced Leadership Skills*, page 173 (FS-1, GS-15)
*PT133 Senior Executive Threshold Seminar*, page 178
*PT107 EEO/Diversity Awareness for Managers and Supervisors*, page 146
*PT102 Deputy Chief of Mission/Principal Officer Seminar*, page 170
*PT120 Ambassadorial Seminar*, page 167

# Distance Learning Quick Guide

## Distance Learning Quick Guide

"Distance Learning" is defined as any formal coursework[1] for which credit is granted where the instructor and student are separated geographically or where there may not be an instructor at all; however, instructional tools are built into the course. Distance Learning may be "synchronous" (i.e., live, real-time course delivery using a variety of communication modes) or "asynchronous" (i.e., any training where interaction is delayed or there is no direct interaction with an instructor). Within distance learning, there are several delivery methods which can be considered synchronous, asynchronous or both:

**Blended (Asynchronous/Synchronous):** Any possible combination of educational delivery methods (i.e., classroom with online, classroom with CD-ROM, online and CD-ROM, etc.) that maximizes the student's learning experience.

**CD-ROM (Asynchronous):** Instruction provided on a compact disc, with read-only-memory, designed to store computer data in the form of text and graphics. The format may be interactive through the use of a variety of technologies; however, the exchange of information is not. Communication with a Department contact may be available as directed in the specific course description.

**DVC (Synchronous):** Instruction provided via a "digital video conference," allowing for real-time, synchronous communication between students and the instructor using a two-way audio, two-way video feed. Multiple visuals can also be incorporated such as PowerPoint and video, making this delivery method one of the most interactive available.

**Online (Asynchronous/Synchronous):** Instruction is provided via the Department of State's OpenNet or the Internet, usually through the FSI LearnCenter. In most cases, all communication between instructor and student is electronic, as is the submission of assignments and examinations.

In some courses, you can set your own pace; in others, you will be mentored, or guided by an instructor. Distance learning is a convenient and highly personalized way to learn.

[1]FSI utilizes a variety of multimedia in both its distance learning and classroom training such as podcasts, video clips, audio files, etc. which can be accessed on-demand.

| FasTrac Distance Learning Program | | | |
|---|---|---|---|
| FasTrac Distance Learning Program | Page 78 | | |
| **Area Studies** | | | |
| AR940 Egypt: Cultural Interactions and Connections | Page 78 | AR950 Russia: Cultural Interactions and Connections | Page 79 |
| **Computer and Communications Systems Technology Skills** | | | |
| YW600 Data Networks, Introduction to | Page 79 | YW302 FASTNet Post Operations and Maintenance | Page 80 |
| YW435 Diplomatic Telecommunications Service Satellite Communications, Introduction to | Page 79 | YW463 IT Contingency Planning | Page 81 |
| YW280 Emergency and Evacuation Radio Skills, Basic | Page 80 | YW141 Telephone Security, Introduction to | Page 81 |
| YW303 FASTNet Core Operations and Maintenance | Page 80 | | |
| **Computer End-User Training** | | | |
| PS784 MS Office 2010: Excel – Mentored, Advanced | Page 81 | PS787 MS Office 2010: Word – Mentored, Advanced | Page 84 |
| PS780 MS Office 2010: Excel – Mentored, Beginning | Page 82 | PS783 MS Office 2010: Word – Mentored, Beginning | Page 84 |
| PS785 MS Office 2010: Outlook – Mentored, Advanced | Page 82 | PS531 SMART End-User Training | Page 85 |
| PS781 MS Office 2010: Outlook – Mentored, Beginning | Page 83 | PS530 SMART Messaging: A Course for Users | Page 85 |
| PS786 MS Office 2010: PowerPoint – Mentored, Advanced | Page 83 | PS532 SMART Messaging: A Course for System Administrators | Page 85 |
| PS782 MS Office 2010: PowerPoint – Mentored, Beginning | Page 83 | | |
| **Consular Training** | | | |
| PC417 Accounting for Consular Fees: Training for the ACO | Page 86 | PC545 Examining U.S. Passports | Page 89 |
| PC419 Collecting Consular Fees: Training for the Consular Cashier | Page 86 | PC402 Immigrant Visa Petitions: Revocation Guidance | Page 89 |
| PC406 Combating Trafficking in Persons | Page 87 | PC102 Immigration Law and Visa Operations | Page 89 |
| PC418 Consular Fees: Training for the Consular Agent | Page 87 | PC103 Nationality Law/Consular Procedures | Page 90 |
| PC533 Consular Management Basics | Page 87 | PC401 Nonimmigrant Visa Petitions: Revocation Guidance | Page 90 |
| PC400 Consular Management Controls | Page 88 | PC104 Overseas Citizens Services | Page 90 |
| PC120 Consular Task Force Basics | Page 88 | PC441 Passport Data Security Awareness | Page 90 |
| PC544 Detecting Fraudulent Documents | Page 88 | PC440 Processing Security Advisory Opinions | Page 91 |
| PC128 Detecting Imposters | Page 88 | | |

## Other Language Courses

| | | | |
|---|---|---|---|
| LAI490 Arabic (Iraqi) | Page 98 | | |

## Out and About

| | | | |
|---|---|---|---|
| L_510 Out and About in [City] | Page 99 | | |

## People to People

| | | | |
|---|---|---|---|
| LRU445 People to People Advanced Russian, Volume I | Page 99 | LRU446 People to People Advanced Russian, Volume II | Page 99 |

## Post Language Program

| | | | |
|---|---|---|---|
| PLP100 Post Language Officer Course | Page 99 | PLP200 Post Language Teacher Orientation | Page 100 |

## Reading Maintenance

| | | | |
|---|---|---|---|
| LAD401 Arabic Reading Maintenance, Volume I | Page 100 | LPY401 Portuguese Reading Maintenance, Volume I | Page 100 |
| LCM401 Chinese (Mandarin) Reading Maintenance, Volume I | Page 100 | LRU401 Russian Reading Maintenance, Volume I | Page 100 |
| LFR402 French Reading Maintenance, Volume II | Page 100 | LRU402 Russian Reading Maintenance, Volume II | Page 100 |
| LPL401 Polish Reading Maintenance, Volume I | Page 100 | LQB401 Spanish Reading Maintenance, Volume I | Page 100 |

## Resource Library

| | | | |
|---|---|---|---|
| SR041 FSI Online Language Resource Library | Page 100 | | |

## Rosetta Stone Language Library

| | | | |
|---|---|---|---|
| SR042 Rosetta Stone Language Training | Page 101 | | |

### Leadership and Management Training

| | | | |
|---|---|---|---|
| PD533 Crisis Management Exercise, Overseas | Page 101 | PT401 No FEAR Act Training | Page 102 |
| PD534 Crisis Management Overview | Page 101 | PD529 Strategic Planning and Performance Measurement | Page 102 |
| PD543 Emergency Action Committee | Page 102 | PT450 Working with Returnees from High Stress Posts | Page 102 |

### Management Tradecraft Training

## Acquisition, Contracting and Procurement Training

| | | | |
|---|---|---|---|
| PA296 How to Be Contracting Officer's Representative | Page 103 | PA229 Simplified Acquisition Procedures | Page 105 |
| EX100 Mission Support Planning (DAU DL Contracting Course) | Page 103 | PA421 Web.PASS Procurement: Basic Overview | Page 105 |
| PA340 Overseas Contracting Officer Update Training | Page 104 | PA425 Web.PASS Procurement: Contracting Officer | Page 106 |
| PA299 Purchase Card Program Coordinator Training | Page 104 | PA422 Web.PASS Procurement: Procurement Department | Page 106 |
| PA297 Purchase Card Self-Certification Training | Page 104 | | |

## Facility Management Training

| | | | |
|---|---|---|---|
| PA489 OBO Security Classification Guide Training | Page 106 | PA526 ProjNet℠ Facilitating Design and Construction Communication | Page 107 |
| PA486 Personal Protective Equipment | Page 107 | PA438 Web.PASS Work Order for Windows | Page 108 |
| PA485 Introduction to Safety, Health and Environment | Page 107 | | |

## Financial Management Training

| | | | |
|---|---|---|---|
| PA461 eAllowance: Per Diem | Page 108 | GFS10 Reading and Understanding Fiscal Data | Page 110 |
| PA462 eAllowance: Retail Price Schedule | Page 108 | PA480 Voucher Examiner Course | Page 110 |
| PA291 How to Be a Certifying Officer | Page 109 | PA423 Web.PASS Procurement: Accounting Department | Page 111 |
| PA367 Overview of Federal Assistance Financial Management | Page 109 | PA424 Web.PASS Procurement: Financial Management Officer | Page 111 |
| PA463 Post Allowance: Retail Price Collecting | Page 109 | PA427 Web.PASS Procurement: Vouchering Department | Page 111 |
| PA300 Purchase Card Designated Billing Official Training | Page 110 | PA368 WebRABIT State Program and PD Budget Preparation Tool | Page 112 |

## Distance Learning Quick Guide

| Overseas Living | | | |
|---|---|---|---|
| PA490 Community Liaison Office Responsibilities, Introduction to the | Page 133 | | |

| Political Training | | | |
|---|---|---|---|
| PE426 Development in Diplomacy and Foreign Policy | Page 134 | PP410 INVEST: Leahy Vetting at Post | Page 135 |
| PP425 Foreign Assistance Program Monitoring and Evaluation | Page 134 | PP411 INVEST: Leahy Vetting in Washington | Page 136 |
| PP422 INL Contract Administration, Procurement Policies and Procedures | Page 134 | PP450 Middle East Partnership Initiative Project Officer | Page 136 |
| PP421 INL Financial Management | Page 135 | PP430 Preparing for an International Organization Meeting | Page 136 |
| PP420 INL Program and Project Management I | Page 135 | PP440 Public-Private Partnerships | Page 137 |

| Public Diplomacy Training | | | |
|---|---|---|---|
| PY435 Audience Research for Effective Public Diplomacy | Page 137 | PY443 Managing Visiting Fulbright Student and Scholar Programs at Post | Page 140 |
| PA460 Digital Technology for Diplomacy | Page 137 | PY432 Media Monitoring and Reporting | Page 140 |
| PY441 Fulbright Program, Introduction to the | Page 138 | PY431 Mission Press Office | Page 141 |
| PY442 Fulbright Program Planning | Page 138 | PY222 Monitoring Grants and Cooperative Agreements | Page 141 |
| PY220 Introduction to Grants and Cooperative Agreements | Page 139 | PY402 Strategic Planning for Public Diplomacy | Page 141 |
| PY424 Managing the International Visitor Leadership Program at Post | Page 139 | PY440 Understanding International Cultural Heritage | Page 142 |
| PY422 Managing Public Diplomacy Resources | Page 139 | PY462 Visual Diplomacy: Engaging Audiences Through Photos and Video | Page 142 |
| PY444 Managing U.S. Fulbright Student and Scholar Programs at Post | Page 140 | PY433 Writing for the Media | Page 142 |

| Regional Programs and Training | | | |
|---|---|---|---|
| RP401 Foreign Service National Leadership | Page 143 | | |

| Security Training | | | |
|---|---|---|---|
| PS830 Active Defense: An Executive's Guide to Information Assurance | Page 143 | EX200 Information Sharing Environment | Page 144 |
| PS800 Cyber Security Awareness | Page 144 | PS820 Personal Identity Verification Module 2 | Page 145 |
| PD538 Domestic Emergency Management | Page 144 | MQ912 Security Overseas Seminar, Advanced | Page 145 |

| Training Skills | | | |
|---|---|---|---|
| PD551 Writing Specific Objectives | Page 145 | | |



## Index

Avaya (Nortel) Meridian 61C/11C (CS1000M) 39

### B

Basic Automotive Technical Training 200
Basic Consular Course 67
Basic Courses: Long-Term Language and Area Studies 162
Basic EEO Counselor Training 146
Basic Emergency and Evacuation Radio Skills 80
Basic Emergency Medical Trauma Training 270
Basic Global Employment Management System Processing 206
Basic Human Resources 208
Basic Knowledge Center Reporting Tool (Person and Position Universe) 209
Basic Leadership Skills 173
Basic Principles of Video Technology and Visual Diplomacy Seminar 245
Basic Telephone 52
Basic Voucher Examination 198
Basics for Overseas Employment 276
Basics of Financial Management Overseas 194
Basics of International Trade 94
Better Office English: Oral 37
Beyond-Three Training, Language 164
Biotechnology and Global Challenges: Trade, Food Security, Energy and Climate Change 150
Bisexual and Transgender in Foreign Service, Lesbian and Gay 279
Briefing and Testifying, Communicating with Congress 168
Budget Techniques 191
Budgeting for Supervisors 192
Building Automation Systems 184
Bureau/Mission Offsites 167
Bureau Press Officers, Tradecraft for 253
Bus Service, Transportation Services 5
Business Application Division 12
Business Case Part I, IT 47
Business Case Part II, IT 47
Business Writing, Writing Skills II – Intermediate 38
Business Writing, Writing Skills III – Advanced 38

### C

CA Systems and Applications, Supporting 52
Cable and Memo Writing 258
CallPilot System Administration, Avaya 39
Cancellation Policy, Language Tests 165
Cancellation Policy, Training 2
Cancellations, No-Shows, and Incompletes 2
Career Builders: Communication Skills 37
Career Development and Long-Term Training 3
Career Transition Center 17
Carpools 3
Cashier, Supervising a 197
Certified Information System Security Professional Review Seminar 40
Certifying Officer, How to be a 109
Change Management 261
Change, Managing 175
Child Care 3

Child, Encouraging Resilience in the FS 279
Children, Raising Bilingual 280
CISSP 40
Citizen Services FSNs, Workshop for Senior American 76
Citizens Services, Overseas 90
Civil Service Employees, Orientation 230
Civil Service Mentoring Workshop 167
Civil Service Office Support Essentials 225
Civil Service Office Support Professionals Program 225
Civil Service Performance Management and Evaluation 119
Civilian Security Tradecraft Course 258
Classified and Sensitive but Unclassified Information: Identifying and Marking 131
Classified Equipment Lifecycle Management 40
Classroom Atmosphere, Dress 3
CLO, Professional Development for 234
Closings, Weather-Related 5
Coaching 167
Coaching and Collaboration 261
Coal and Power Technology 150
Collecting Consular Fees: Training for the Consular Cashier 86
Combating Trafficking in Persons 87
Commercial Acquisitions, FSN 182
Commercial Terminal Satellite Operations 40
Commercial Tradecraft 152
Commercial Tradecraft, Introduction to 91
Communicating Across Cultures 275
Communicating with Congress: Briefing and Testifying 168
**Communication and Public Speaking** 37
Communication Skills 262
Communication Skills, Career Builders: 37
Communication Skills, Foreign Service National 263
Communication Terminals SC-3 and SC-7 50
Communications, FAST Backup 43
Compensation, LE Staff 209
Competencies and Precepts 18
Comprehensive Feedback Instruments for Senior Executives, the Ultimate 360 180
**Computer and Communications Systems Technology Skills** 39, 79
**Computer End-User Skills** 55, 81
COMSEC and CRYPTO 41
Conflict Management 262
Conflict, Managing Productively 176
Congress: Briefing and Testifying, Communicating with 168
Congressional Relations 235
Construction Facility and Security Management Training, OBO 188
Consular Adjudicators, Orientation for 231
Consular Agents' Workshop 75
Consular and Duty Officer Responsibilities, Orientation to Overseas 72
Consular Country Coordinators Workshop 66
Consular Course, Advanced 67
Consular Course, Basic 67
Consular Courses, General 66
Consular Fees: Training for the ACO, Accounting for 86
Consular Fees: Training for the Consular Cashier, Collecting 86

Consular Fees: Training for the Consular Agent 87
Consular FSN and Consular Agents 75
Consular FSNs, Regional Workshop for Senior 76
Consular Fundamentals for Mid-level Officers 68
Consular Leadership Development Course 68
Consular Management Basics 87
Consular Management Controls 88
Consular Managers, Automated Systems for 66
Consular Managers, Fraud Prevention for 70
Consular Namechecking and Identity Recognition Techniques Overview, Advanced 69
Consular Officers Workshop, Regional 74
Consular Procedures/Nationality Law 90
Consular Section Chief Basics 69
Consular Task Force Basics 88
Consular Tradecraft, Language for 97
**Consular Training** 66, 86
Consular Training, Distance Learning 88
Consular Training Division 15
Consular Training for Principal Officers 69
Consular Training Segments 70
Consultation: Learning Styles Diagnosis 165
Consultation: Learning Styles Diagnosis Follow-up Appointment 165
Contact Database User Training 225
Contact Numbers 6
Contingency Planning, IT 81
Contingency Planning, IT Disaster Recovery and 47
Contract Administration Workshop 181
Contracting Officer's Representative 181
Contracting Officer's Representative, DS 182
Contracting Officer's Representative, How to be a 103
Contracting Officer Update Training, Overseas 104
Contractor Officer Approval Memo 7
Contracts Workshop, Special 184
Conversations, Crucial 169
Conversion, Language 97
COR Training 103, 181, 182
Core Operations and Maintenance, FASTNet 43, 80
Corruption, New Approaches to Addressing 154
Counselor Seminar, Political/Economic 149, 238
Counselor Training, EEO Basic 146
Counselor Training, EEO Refresher 146
Creating Digital Media for Public Diplomacy Outreach 245
Creative Problem Solving 168
Crisis Leadership 168
Crisis Management Exercise, Overseas 101, 168
Crisis Management Military Exercise, Advanced 169
Crisis Management Overview Overseas 101, 169
Crisis Management Training 11
Cross-Cultural Values 262
Crucial Conversations 169
CRYPTO, COMSEC and 41
CS Mentoring Workshop 167
CS1000 Database Administration Release 6.0 and Up 41
CS1000 Release 7.5 Installation and Maintenance 41

(CS1000M), Avaya (Nortel) Meridian 61C/11C 39
Cultural Diplomacy, Seminar on Advanced 244
Cultural Heritage, Understanding International 142
Cultural Interactions and Connections: Egypt 78
Cultural Interactions and Connections: Russia 79
Current Installation Practices 42
Curriculum and Staff Development Division 15
Customer-Focused Performance 263
Customer Service Training 217, 263
Customized Applications Training 55
Customized MS Office Applications 59
Cyber Security Awareness 144

**D**

Data Networks, Introduction to 79
Data Security Awareness, Passport 90
DAU DL Contracting Course, Mission Support Planning 103
DCM/Principal Officer Spouse, The Role of the 279
DCM/Principal Officers Seminar 170
Decision-Making, Managerial Problem Solving and 175
Definitions of FS Precepts 20
Definitions of OPM Competencies 18
Department of State Employee, Training Applications 1, 7, 8
Department of State Environment, SIPRNet in the 65
Department of State: History, Authorities and the Interagency Process 132
Deputy Chiefs of Mission/Principal Officers Seminar 170
Detecting Fraudulent Documents 88
Detecting Imposters 88
Development in Diplomacy and Foreign Policy 134
Digital Media for Public Diplomacy Outreach, Creating 245
Digital Satellite Terminal Operations 42
Digital Technology for Diplomacy 137
Diplomacy, Multilateral 157
Diplomatic History of the United States 230
Diplomatic Telecommunications Service Satellite Communications, Introduction to 42, 79
Diplomatic Security Agents, Language for 97
Diplomatic Security Contracting Officer's Representative 182
Diplomats Overseas Preparedness, Young 280
Directions/Maps 3, 293
Disability and Reasonable Accommodations 116
Disaster Recovery and Contingency Planning, IT 47
Distance Learning 3, 26, 78
**Distance Learning** 78
Distance Learning Course List, Quick Guide 26
Distance Learning Language Resources 100
Diverse Workforce, Leading in a 146
**Diversity** 146
Diversity Awareness for Managers and Supervisors, EEO 146
Diversity in the Workplace, Valuing 147

Domestic Adjudicators, Passport and Nationality for 73
Domestic Emergency Management 144
Domestic Management Officers Seminar 217
Dress/Classroom Atmosphere 3
DTS Satellite Communications, Introduction to 42, 79
Duplexer Tuning and Installation 43
Duty Officer Responsibilities, Introduction to Post 130
Duty Officer Responsibilities, Orientation to Overseas Consular 72

**E**

E2 Solutions: Online Booking Engine 127
E2 Solutions: System Administrator 128
E2 Solutions: Travel Approver 128
E2 Solutions: Travel Arranger 128
E2 Solutions: Traveler 129
eAllowances: Per Diem 108
eAllowances: Retail Price Schedule 108
**Economic and Commercial Studies** 148
   Economic Courses 148
   Environment and Resource Courses 150
   Trade Investment and Commercial Training 152
Economic and Commercial Training Division 15
Economic Counselor Seminar, Political/ 149, 238
Economic Issues 148
Economic Studies, Foreign Service 148
Economic Tradecraft, Political/ 149, 231
Economic Training, Distance Learning 91
Economic Training, Foreign Service National 149
eCountry Clearance:
   Approver 129
   Post Administrator 129
   Requestor 129
Educational and Cultural Seminar for Public Diplomacy LE Staff 255
EEO Counselor Training, Basic 146
EEO Counselor Training Refresher 146
EEO/Diversity Awareness for Managers and Supervisors 146
Effective Feedback Skills 170
Effective Meetings, Running 178
Effective Speaking and Listening Skills 37
Effectively, Managing Your Time 177
Effectively Working with Your Manager, Managing Up: 176
Egypt: Cultural Interactions and Connections 78
Electrical Power Generation for Facility Managers 184
Elevator Maintenance Management 185
Emergency Action Committee 102
Emergency and Evacuation Network - HF, Regional 50
Emergency and Evacuation Network - VHF/UHF, Local 48
Emergency and Evacuation Radio Skills, Basic 80
Emergency Management, Domestic 143
Emergency Medical Trauma Training, Basic 270
Employee Relations Seminar 170
Employment Options, International Development and NGOs 276

Employment Options, Portable Careers 276
Employment Tools for Foreign Service Life 275
Encouraging Resilience in the Foreign Service Child 279
Energy Seminar, Washington 152
English, Better Office Oral 37
English Language Programs in Public Diplomacy 246
Enhancing Training with Learning Technology 243
Enrolling in Transition Center Courses 17
Entering the Foreign Affairs Community 17
Enterprise Technology Division 12
Environment, Science, Technology and Health for Foreign Service Nationals 150
Environment, Science, Technology and Health Tradecraft 151
Environment and Resource Courses 150
ePerformance for Civil Service 117
ePerformance for Foreign Service 117
Equipment Lifecycle Management, Classified 40
Essential Skills for Facilitating Groups 272
Essentials of Overseas Management 218
Estate Planning Workshop, Financial Management and 268
ESTH Courses 150, 151
Ethics – Financial Disclosure Initial Reviewer Training 117
Ethics in the Grants Environment 246
Ethics Orientation:
   New Employees 118
   New Locally Employed Staff 118
   Special Government Employees 118
Ethics Training, Annual 116
EUR-IO HR American Programs Training 205
Evacuation Management System, Introduction to the 118
Evacuation Network - HF, Regional, Emergency and 50
Evacuation Network-VHF/UHF, Local Emergency and 48
Evacuation Radio Skills, Basic Emergency and 80
Examining U.S. Passports 89
Exchange Server 2010, Microsoft 49
Excel 2010, MS
   Excel 2010 - Level One 57
   Excel 2010 - Level Two 57
    Excel - Mentored, Advanced MS Office 2010 81
    Excel - Mentored, Beginning MS Office 2010 82
   Excel 2010 - MOS 58
Executive Development Division 11
Executive Leadership Seminar, National Security 177
Executive Overview to Managing State Projects 221
Executive Threshold Seminar, Senior 178
Executive's Guide to Information Assurance, Active Defense: An 143
Explaining America 275
Express Language 94-96
External Training 3
External Training, Applications for 4, 7, 9



# EXHIBIT E

**Devon Hewitt**

| | |
|---|---|
| **From:** | Mark Gross <mark.gross@oakgrovetech.com> |
| **Sent:** | Friday, August 22, 2014 6:56 PM |
| **To:** | Devon Hewitt; Jim Kinsel |
| **Subject:** | Fwd: Question in regards to solicitation SFSIAQ14R0002 |

Mark Gross
Oak Grove Technologies
Sent from my iPhone

Begin forwarded message:

> **From:** Kyle Holmquist <Kyle.Holmquist@oakgrovetech.com>
> **Date:** August 22, 2014 at 6:54:43 PM EDT
> **To:** Mark Gross <mark.gross@oakgrovetech.com>, Moner Attwa <Moner.Attwa@oakgrovetech.com>
> **Subject: FW: Question in regards to solicitation SFSIAQ14R0002**
>
> Moner and Mark,
> Here is the email from the CO answering questions that Moner submitted separately.
>
> Kyle
>
> **Kyle Holmquist, PMP | VP, Technology and eLearning Solutions | Oak Grove Technologies**
> 4140 Parklake Avenue, Suite 330
> Raleigh, NC 27612
> Desk: **919.278.2224**
> Cell: **919.634.2460**
> kyle.holmquist@oakgrovetech.com
> www.oakgrovetech.com
> *Our service continues...*

**From:** Moner Attwa [mattwa@WSL-LLC.com]
**Sent:** Tuesday, July 01, 2014 9:37 AM
**To:** Kyle Holmquist
**Subject:** FW: Question in regards to solicitation SFSIAQ14R0002

Please see below

Moner

**From:** Shokry, Nadia [mailto:ShokryNO@state.gov]
**Sent:** Monday, June 30, 2014 4:09 PM
**To:** Moner Attwa
**Subject:** RE: Question in regards to solicitation SFSIAQ14R0002

Good afternoon Mr. Attwa,

Please find the responses below:

1. All awarded companies will have the opportunity to compete for the incumbent personnel during the right of first refusal process. This does not mean that the incumbent contractor will retain all the incumbent personnel (if the incumbent submits a proposal and is awarded a Task Order). There is no minimum dollar guarantee on any of the awarded Task Orders.

2. Please reference the question and answer document. The document clearly states that "the prime and subcontractor must have the required secret facility clearance at time of proposal submission and upon contract award."

3. Please see the answer in the question and answer document and answer to question 1 above. The funding will be divided among the awarded companies by the results of the right of refusal process.


Sincerely,

**Nadia Shokry**
Contracting Officer
Acquisitions Office
Foreign Service Institute (FSI/EX/ACQ)
(P) 703-302-6804
(F) 703-302-7227
(Rm) SA-42 F2130


**From:** Moner Attwa [mailto:mattwa@WSL-LLC.com]
**Sent:** Thursday, June 26, 2014 2:07 PM
**To:** Shokry, Nadia
**Subject:** Question in regards to solicitation SFSIAQ14R0002

Hi Ms. Shokry:

We are interested in bidding Solicitation #SFSIAQ14R0002 but need some further clarification on the government's answer to Question #14.

## Question 1

The RFQ states in section 4 page 25 that the current personal has right of first refusal and that the government will provide the list of all incumbent personnel but the answer to question 14 states the results of the right of first refusal process will determine the division of labor categories between contractors. The Government does not intend to split contractors by labor category, but by individual staff within categories. The Government intends that individual project teams (i.e. a specific eLearning course or a specific technical effort) will be comprised of mixed contracts rather than each labor category being awarded to one contractor.

Can the government please clarify if this means that the company that has the incumbent personal will receive most of positions? If so, what is the plan for the other companies that receive an award and will they have a minimum guarantee of dollars on the contract?

## Question 2

If we have a secret facility clearance can we bring on a subcontract that does not have a clearance currently but not provided them with any workshare on the contract until they complete their clearance process?

## Question 3

2